[No. H029818. Sixth Dist. Sept. 21, 2007.]

THOMPSON PACIFIC CONSTRUCTION, INC., Plaintiff, Cross-defendant and Appellant, v.
CITY OF SUNNYVALE, Defendant, Cross-complainant and Respondent.

526

532

COUNSEL

McInerney & Dillon, Robert L. Leslie and Alexander Bannon for Plaintiff, Cross-defendant and Appellant.

McDonough Holland & Allen, Benjamin L. Stock, Wynne S. Furth, Natalie E. West; David E. Kahn, City Attorney, and Rebecca L. Moon, Assistant City Attorney, for Defendant, Cross-complainant and Respondent.

Edmund G. Brown, Jr., Attorney General, David S. Chaney, Chief Assistant Attorney General, Alfredo Terrazas, Assistant Attorney General, Frank H. Pacoe and Joshua A. Room, Deputy Attorneys General, for Registrar of Contractors, Contractors' State License Board as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

Goodin, MacBride, Squeri, Day & Lamprey, Wayne T. Lamprey and Francine T. Radford for Taxpayers Against Fraud Education Fund as Amicus Curiae on behalf of Defendant, Cross-complainant and Respondent.

OPINION

**PREMO, J.**—Thompson Pacific Construction, Inc. (Thompson), entered into a contract with the City of Sunnyvale (City) for construction of a public building. Disputes arose leading to this lawsuit in which the parties sued each other for breach of contract and various statutory violations. A jury rendered a verdict in favor of City, awarding damages for breach of the covenant of good faith and fair dealing and statutory penalties under the Subletting and Subcontracting Fair Practices Act (Pub. Contract Code, § 4100 et seq.) (FPA)[1] and California's False Claims Act (Gov. Code, § 12651) (CFCA). Thompson appeals.

---

[1] Further unspecified code references are to the Public Contract Code.

We conclude that the trial court did not have jurisdiction to impose penalties under the FPA. We also conclude that the evidence was insufficient to support the amount of damages the jury awarded for breach of the covenant of good faith but since the trial court subtracted the full amount of those damages from the judgment the error does not warrant reversal. We reject Thompson's remaining claims, modify the judgment to strike the FPA penalties, and as modified, affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Introduction*

On April 5, 2002, Thompson and City entered into a contract under which Thompson was to build the Sunnyvale Senior Center. The contract provided that Thompson would substantially complete the project by May 27, 2003, and have it finally completed 30 days later.

Problems arose during construction and the building was not substantially complete by the end of May 2003. City moved its administrative staff into the building in June and held a grand opening on July 19, 2003. Thompson submitted its final billing immediately thereafter but City refused to release the full contract price, maintaining that the project was still incomplete and did not conform to the quality standards of the contract. There followed a contentious dispute about the work that remained to be done accompanied by Thompson's repeated demands for full payment.

Thompson completely ceased work in November 2003 without completing the project. City filed a notice of cessation, stating that work on the project had ceased on November 21, 2003, and completed the project itself.

Pursuant to the contract, City had retained 10 percent of each progress payment it made to Thompson during the course of construction. The total amount withheld is referred to as the "retention." City eventually released all but $279,428 of the retention, which City withheld for work it claimed was either not complete or completed improperly and as liquidated damages for delayed completion.

### B. *Thompson's Second Amended Complaint*

Thompson sued City to recover the unpaid retention and additional damages for extra work. Thompson's first cause of action for breach of contract alleged that City's plans and specifications were deficient, which caused Thompson to perform extra work outside the scope of the contract, delayed performance, and caused Thompson to incur additional costs. Thompson also

alleged that City purposefully delayed the issuance of change orders, withheld payment for work performed under the contract, and failed to pay interest on the improperly withheld payments. A second cause of action alleged violation of section 7107, which requires prompt payment for the construction of any public work of improvement.

### C. *City's Cross-complaint*

City filed a cross-complaint in which it alleged that Thompson had falsified its bid documents, failed to pursue the project diligently, failed to complete the project, refused to cooperate in closing out the project, harassed City staff, improperly substituted subcontractors, and submitted pay requests for work that had not been completed. The cross-complaint contained five causes of action: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) breach of express warranty, (4) declaratory relief, and (5) violation of the FPA. The FPA cause of action sought damages and statutory penalties.

### D. *City's Amended Cross-complaint*

On September 30, 2005, the Friday before trial was set to begin, City filed a request for leave to amend its cross-complaint to add six causes of action for violation of the CFCA. Thompson opposed the request but declined the trial court's invitation to continue the trial date. The trial court granted the motion. City filed the amended cross-complaint on October 11, 2005, while trial was underway. Thompson promptly filed a demurrer. The trial court overruled the demurrer, finding that Thompson had waived its right to demur by agreeing to go to trial.

### E. *The Judgment*

The jury rejected Thompson's two causes of action, finding that City had not breached the contract and that it had not improperly withheld the retention beyond the date allowed by section 7107. As to City's cross-complaint, the jury found that Thompson had breached the implied covenant of good faith and fair dealing. (The special verdict form did not ask the jury to decide whether Thompson had also breached the express terms of the contract.) The jury determined that as a result of Thompson's breach of the covenant City suffered damages of $279,428—the exact amount Thompson claimed City had wrongfully withheld from payment under the contract. The jury also found that Thompson had submitted three false claims in violation of the CFCA, that City suffered no compensatory damages, and that Thompson should be assessed a penalty of $10,000 for each false claim. Finally, the jury found that Thompson had violated the FPA by substituting

subcontractors it had not listed in its bid documents but that City had suffered no compensatory damages as a result. The jury assessed a total penalty of $91,067.09 for the FPA violations.

Thompson moved for a new trial arguing, among other things, that the trial court did not have jurisdiction over the FPA claims because the Public Contract Code vests that jurisdiction in the "awarding authority." (§ 4110.) The trial court denied the motion, concluding that a new trial would not remedy a lack of jurisdiction.

The trial court entered judgment for City. The court calculated the amount of the judgment by adding the jury's award for breach of the covenant of good faith and fair dealing ($279,428) and the CFCA and FPA penalties ($30,000 and $91,067.09). Presumably intending to avoid giving City a double recovery, the trial court then subtracted $279,428, the amount City already held, from the total of the jury's award, making the net judgment $121,067.09 plus attorney fees and costs. Pursuant to section 7107, the trial court awarded attorney fees of $377,799 to City. Thompson has timely appealed.

## II. CONTENTIONS

Thompson raises the following contentions on appeal:

A. The trial court lacked jurisdiction to consider City's FPA claim;

B. There was insufficient evidence to support the jury's award of $279,428 as damages for breach of the covenant of good faith and fair dealing;

C. The trial court abused its discretion in granting leave to amend the cross-complaint and erred in failing to rule upon Thompson's demurrer;

D. The trial court erred in refusing Thompson's special instruction defining the phrase "false claim" for purposes of the CFCA causes of action;

E. The special verdict form was insufficient;

F. The jury instruction on breach of the implied warranty of correctness was insufficient;

G. The trial court erred in admitting evidence of Thompson's destruction of documents and evidence that a subcontractor did not pay prevailing wages;

H. The jury awarded inadequate damages to Thompson;

I. The attorney fee award of $377,799 is unjustified, excessive, and should have required a finding that Thompson's suit was frivolous.

### III. DISCUSSION

#### A. *Jurisdiction over FPA Claim*

##### 1. Background

Thompson argues that under section 4110, the trial court did not have jurisdiction over the FPA cause of action. Although Thompson's argument is nominally directed to the whole of City's FPA claim, the concern is, in substance, that the trial court awarded penalties that only City had the power to impose. (§ 4110.) We begin our discussion with a brief summary of the relevant provisions of the FPA.

■ The FPA requires that, in bidding to construct a work of public improvement, a prime contractor must list each subcontractor that will perform more than one-half of 1 percent of the total bid. (§ 4104, subd. (a).) A prime contractor whose bid is accepted may not "[s]ubstitute a person as subcontractor in place of the subcontractor listed in the original bid" absent specified circumstances and the approval of the awarding authority. (§ 4107.) Section 4110 provides penalties for violation of these provisions: "A prime contractor violating any of the provisions of this chapter violates his or her contract and *the awarding authority may exercise the option, in its own discretion*, of (1) canceling his or her contract or (2) assessing the prime contractor a penalty in an amount of not more than 10 percent of the amount of the subcontract involved, and this penalty shall be deposited in the fund out of which the prime contract is awarded. In any proceedings under this section the prime contractor shall be entitled to a public hearing and to five days' notice of the time and place thereof." (Italics added.)

##### 2. Issue and Standard of Review

Thompson argues that since section 4110 gives the "awarding authority" the discretion to impose the penalties, the trial court did not have jurisdiction to impose penalties in the first instance. City's primary argument in opposition is that Thompson waived the issue by not raising it until after the jury rendered its verdict. City assumes that Thompson's argument is, in effect, a claim that City failed to exhaust its administrative remedies. But Thompson does not argue that City failed to pursue some procedural prerequisite to the

lawsuit. Thompson contends that the trial court lacked fundamental jurisdiction over the FPA claims, an issue that may not be waived. (*DeTomaso v. Pan American World Airways, Inc.* (1987) 43 Cal.3d 517, 520, fn. 1 [235 Cal.Rptr. 292, 733 P.2d 614].) Accordingly, we must decide whether the trial court possessed fundamental jurisdiction to impose penalties under section 4110. If the court lacked fundamental jurisdiction, the judgment is a nullity and the waiver doctrine would not apply. But if the court acted merely in excess of its jurisdiction, then the judgment is voidable only and we may consider the waiver argument. (Cf. *Conservatorship of O'Connor* (1996) 48 Cal.App.4th 1076, 1088 [56 Cal.Rptr.2d 386].)

■ The question of the trial court's jurisdiction is a pure question of law subject to our independent review. (*Conservatorship of Kane* (2006) 137 Cal.App.4th 400, 405 [40 Cal.Rptr.3d 378]; *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 801 [35 Cal.Rptr.2d 418, 883 P.2d 960].) To the extent the issue requires interpretation of section 4110, we apply settled rules. Our fundamental task is to ascertain the intent of the Legislature. (*People v. Connor* (2004) 115 Cal.App.4th 669, 678 [9 Cal.Rptr.3d 521].) We do that by first examining the statutory language, giving the words their usual and ordinary meaning. If there is no ambiguity the plain meaning governs. (*Ibid.*) If the statutory language permits more than one reasonable interpretation, we may resort to extrinsic aids, including the rules of statutory construction and consideration of the evils to be remedied by the statutory scheme at issue, to help us select the interpretation that comports most closely with the lawmakers' intent. (*Ibid.*)

### 3. Lack of Jurisdiction

■ The dispositive issue is whether imposition of the statutory penalties was an act in excess of jurisdiction or whether the trial court completely lacked jurisdiction to grant such relief. Judgments or orders that are in excess of jurisdiction are valid unless attacked. (*Conservatorship of O'Connor, supra,* 48 Cal.App.4th at p. 1088.) An excess of jurisdiction is typically described as the case " 'where, though the court has jurisdiction over the subject matter and the parties in the fundamental sense, it has no "jurisdiction" (or power) to act except in a particular manner, or to give certain kinds of relief, or to act without the occurrence of certain procedural prerequisites.' " (*Law Offices of Stanley J. Bell v. Shine, Browne & Diamond* (1995) 36 Cal.App.4th 1011, 1022 [43 Cal.Rptr.2d 717], quoting *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942] (*Abelleira*).) It is generally accepted that when a court has jurisdiction of the subject, "a party who seeks or consents to action beyond the court's power as defined by statute or decisional rule may be estopped to complain of the ensuing action in excess of jurisdiction." (*In re Griffin* (1967) 67 Cal.2d 343, 347 [62 Cal.Rptr. 1,

431 P.2d 625].) "Whether [the party] shall be estopped depends on the importance of the irregularity not only to the parties but to the functioning of the courts and in some instances on other considerations of public policy." (*Id.* at p. 348.)

■ A trial court lacks jurisdiction in the fundamental sense where there is "an entire absence of power to hear or determine the case, an absence of authority over the subject matter or the parties." (*Abelleira, supra,* 17 Cal.2d at p. 288.) For example, a state court has no jurisdiction "to determine title to land located outside its territorial borders," to "render a personal judgment against one not personally served with process," or to determine a case "where the type of proceeding or the amount in controversy is beyond the jurisdiction defined for that particular court by statute or constitutional provision." (*Ibid.*) Judgments or orders by a court that lacks jurisdiction in this fundamental sense are void. (*Conservatorship of O'Connor, supra,* 48 Cal.App.4th at pp. 1087–1088.) Objection may be raised at any time since the parties cannot confer jurisdiction by consent; a judgment rendered in the absence of fundamental jurisdiction is simply a nullity. (*Dabney v. Dabney* (2002) 104 Cal.App.4th 379, 383–384 [127 Cal.Rptr.2d 917], citing 2 Witkin, Cal. Procedure (4th ed. 1996) Jurisdiction, § 12, pp. 556–558.)

■ Even where there is jurisdiction over the parties and the general subject matter, fundamental jurisdiction may be absent when a trial court purports to grant relief that it has no authority to grant. (See *Grannis v. Superior Court* (1905) 146 Cal. 245, 255 [79 P. 891].) In *Carlson v. Eassa* (1997) 54 Cal.App.4th 684, 692 [62 Cal.Rptr.2d 884] (*Carlson*), for example, the trial court accepted a stipulation modifying a child support order that had been submitted by the district attorney without the written consent of the parent as required by the Welfare and Institutions Code. This court held that the trial court was without authority to enter the order. "This is not merely a mistaken application of the law or a grant of excess relief, but a complete absence of power to accord relief, a judgment 'completely outside the scope of the court's jurisdiction to grant . . . .' " (*Id.* at p. 696, quoting *Jones v. World Life Research Institute* (1976) 60 Cal.App.3d 836, 845 [131 Cal.Rptr. 674].) "As one court has suggested, 'The mere fact that the court has jurisdiction of the subject matter of an action before it does not justify an exercise of a power not authorized by law, or a grant of relief to a party that the law declares shall not be granted.' (*Selma Auto Mall II* v. *Appellate Department* (1996) 44 Cal.App.4th 1672, 1683–1684 [52 Cal.Rptr.2d 599].)" (*Carlson, supra,* 54 Cal.App.4th at p. 696.) A similar case is *Plaza Hollister Ltd. Partnership v. County of San Benito* (1999) 72 Cal.App.4th 1, 26 [84 Cal.Rptr.2d 715], in which this court held that a judgment setting the value of property for tax purposes was void. Since the California Constitution vested the assessment power in the county board of

equalization, the trial court did not have power, under any circumstances, to make such a determination. (*Ibid.*)

### 4. Analysis

■ Section 4110 plainly gives the awarding authority discretion to impose monetary penalties for violation of the FPA. There is no provision in section 4110 or elsewhere in the FPA that allows the awarding authority to pursue a civil action for monetary penalties as there is, for example, in the CFCA. (Gov. Code, § 12652.) ■ It is true that the trial court has a range of inherent powers that it may exercise in order to accomplish complete justice between parties. (*People ex rel. Van de Kamp v. American Art Enterprises, Inc.* (1983) 33 Cal.3d 328, 334 [188 Cal.Rptr. 740, 656 P.2d 1170].) But a court has no power to award civil monetary penalties in the absence of explicit statutory authorization. (Cf. *ibid.*)[2]

■ General principles of administrative law support the conclusion that the trial court did not have jurisdiction to impose penalties under section 4110. "As a general rule, powers conferred upon public agencies and officers which involve the exercise of judgment or discretion are in the nature of public trusts and cannot be surrendered or delegated to subordinates in the absence of statutory authorization." (*California Sch. Employees Assn. v. Personnel Commission* (1970) 3 Cal.3d 139, 144 [89 Cal.Rptr. 620, 474 P.2d 436].) Although the trial court cannot be characterized as City's subordinate, it is not the body to which the Legislature entrusted discretion to enforce the provisions of the FPA. As stated in *Bank of Italy v. Johnson* (1926) 200 Cal. 1, 15 [251 P. 784], the head of an agency "may not by the adoption of any rule of policy or procedure so circumscribe or curtail the exercise of his discretion under the statute as to prevent the free and untrammeled exercise thereof in every case, for an attempt to do so would be for him to arrogate to himself a legislative function."

Furthermore, administrative remedies, and the concomitant exhaustion requirement, serve the "salutory [*sic*] goals of easing the burden on the court system, maximizing the use of administrative agency expertise and capability to order and monitor corrective measures, and providing a more economical and less formal means of resolving the dispute." (*Rojo v. Kliger* (1990) 52

---

[2] Section 4103 states that nothing in the FPA "limits or diminishes any rights or remedies, either legal or equitable" that the public agency may have against the prime contractor. (§ 4103, subd. (a).) City argues that this section permits the trial court to award section 4110 penalties but that is not so. Section 4103 means only that City may avail itself of any lawful remedies in addition to those allowed under the FPA. There is no question that section 4110 penalties are available to City. The question is whether City may obtain those penalties by filing a civil lawsuit. Section 4103 has no bearing upon that question.

Cal.3d 65, 83 [276 Cal.Rptr. 130, 801 P.2d 373].) The exercise of discretion in determining whether and how much of a penalty to impose upon a prime contractor that violates the FPA requires consideration of the nature of the violations and the interests the FPA was designed to advance. It is a "complex determination, requiring exercise of subtle administrative judgment . . . ." (*D.H. Williams Construction, Inc. v. Clovis Unified School Dist.* (2007) 146 Cal.App.4th 757, 766 [53 Cal.Rptr.3d 345].) By including a demand for section 4110 penalties in its cross-complaint, City delegated its judgment to the trial court. This was impermissible.

City maintains that it was entitled to pursue a civil action for section 4110 penalties because it did not learn about all of Thompson's violations until after this lawsuit was filed and it obtained some information during discovery. City's argument seems to suggest that it was precluded from exercising its own discretion to impose section 4110 penalties by the time litigation had commenced. It does appear from the statutory scheme that the Legislature expected the awarding authority to enforce the provisions of the FPA while the project is underway—not after it is completed. One purpose of the FPA "is to ensure that the contracting authority—the *public agency* involved—has an opportunity to investigate and approve any subcontractor who is proposed to work on the project." (*R. M. Sherman Co. v. W. R. Thomason, Inc.* (1987) 191 Cal.App.3d 559, 566 [236 Cal.Rptr. 577].) This grant of power to the public agency is intended to prevent bid shopping and bid peddling,[3] practices that the Legislature has found detrimental to the public. (§ 4101.) The provisions of the FPA rest upon the basic principle "that the public is entitled to know exactly what it is paying for when it accepts a contractor's bid, and to get exactly that unless it consents to something different." (*R. M. Sherman Co. v. W. R. Thomason, Inc., supra,* 191 Cal.App.3d at p. 567.) To that end, "the contracting agency has a right to investigate any proposed subcontractor, to reject the prime bid if any subcontractor is unacceptable, and to veto any proposed substitution after the bid is accepted." (*Ibid.*)

This scheme plainly contemplates that the awarding authority will monitor the project during construction to ascertain the contractor's compliance with its contractual and statutory obligations. That said, the FPA contains no express time limit upon the exercise of that discretion. Nor would it conform to the spirit of the law to presume that the public entity has no power to sanction a contractor whose surreptitious violations do not come to light until after the project is complete. But even if the law may be read to limit the

---

[3] " 'Bid shopping is the use of the low bid already received by the general contractor to pressure other subcontractors into submitting even lower bids. Bid peddling, conversely, is an attempt by a subcontractor to undercut known bids already submitted to the general contractor in order to procure the job.' " (*R. M. Sherman Co. v. W. R. Thomason, Inc., supra,* 191 Cal.App.3d at p. 567, fn. 8, quoting *Southern Cal. Acoustics Co. v. C. V. Holder, Inc.* (1969) 71 Cal.2d 719, 726, fn. 7 [79 Cal.Rptr. 319, 456 P.2d 975].)

agency's discretion to the period of construction, an issue we do not decide today, there is nothing in the statutory scheme to suggest that the trial court would thereafter acquire the power it plainly did not have earlier.

■ We conclude that we would pervert the intent of the statutory scheme and contravene basic principles of administrative law if we were to read section 4110 as permitting the court, at the request or with the consent of the parties, to impose penalties the Legislature clearly intended City to impose. (Cf. *Grannis v. Superior Court, supra*, 146 Cal. at p. 251.) Accordingly, neither City, by filing its lawsuit seeking statutory penalties, nor Thompson, by failing to object to jurisdiction during trial, could confer jurisdiction upon the court to impose section 4110 penalties. To the extent the judgment purports to impose a penalty under section 4110, it is void.

### B. Damages for Breach of the Implied Covenant of Good Faith

■ "The covenant of good faith is implied as a supplement to express contractual covenants to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Charpentier v. Los Angeles Rams Football Co.* (1999) 75 Cal.App.4th 301, 314 [89 Cal.Rptr.2d 115].) Where, as here, a party's action for breach of the covenant of good faith and fair dealing does not sound in tort, the action is just "another 'garden variety breach of contract' action for which only contract damages may be recovered." (*California Fair Plan Assn. v. Politi* (1990) 220 Cal.App.3d 1612, 1619 [270 Cal.Rptr. 243], quoting *Liberty Mut. Ins. Co. v. Altfillisch Constr. Co.* (1977) 70 Cal.App.3d 789, 797 [139 Cal.Rptr. 91].) As in any contract action, "[i]t is essential to establish a causal connection between the breach and the damages sought." (1 Witkin, Summary of Cal. Law (10th ed. 2005) ch. I, § 870, p. 956; see also Civ. Code, § 3300.)

Thompson argues that there is no evidence its breach of the covenant caused damages of $279,428. According to Thompson, $279,428 is the amount City withheld from payment under the contract and, therefore, this amount reflects damages caused by breach of the express terms of the contract, not breach of the implied covenant.[4]

Since the issue before us concerns the sufficiency of the evidence, "we must consider all of the evidence in the light most favorable to the prevailing

---

[4] The record and the parties' briefs contain slightly differing references to the amount the parties agreed was in dispute. The parties' written stipulation entered into evidence at trial and the judgment itself show $279,428 as the disputed amount withheld.

party, accept as true all the evidence and reasonable inferences therefrom that tend to establish the correctness of the trial court's findings and decision, and resolve every conflict in favor of the judgment." (*Baxter Healthcare Corp. v. Denton* (2004) 120 Cal.App.4th 333, 369 [15 Cal.Rptr.3d 430].)

City's cause of action for breach of the covenant alleged that City had been injured by Thompson's refusal to negotiate in good faith to close out the project. The alleged breach involved hundreds of faxed demands for payment, Thompson's refusal to negotiate about work that was incomplete or needed correction, and problems with subcontractors, among other things. In her argument to the jury, City's counsel stressed that City's damages for breach of the implied covenant were the expenses City incurred after Thompson had ceased performance. Counsel highlighted the testimony of City's assistant director of public works, Barbara Keegan, who testified that City staff had spent a great deal of time trying to reach a resolution with Thompson, struggling with stop notices filed by subcontractors, and handling disputes with other subcontractors. Keegan estimated the value of these efforts at $82,000. City also spent an additional $39,000 after Thompson ceased work in November 2003 to complete work on the building. Counsel asked the jury to award these amounts, a total of $121,000, as damages for breach of the covenant.

Although the jury found that Thompson had breached the covenant, it did not award the damages counsel requested but awarded $279,428 instead. It is undisputed that $279,428 is the amount City had withheld from payment for Thompson's failure to perform under the contract. This amount, therefore, was not caused by Thompson's bad faith conduct after it ceased working on the project.

Thompson argues that if we conclude there is no substantial evidence to support the damage award, "the City owes these funds to Thompson and the jury's finding that the City did not breach its contract cannot stand." We disagree. Thompson claimed that City had breached the contract by failing to pay the contract balance but the jury found that City had not breached the contract, impliedly finding that City was entitled to keep the $279,428. Its mistaken selection of $279,428 as damages for breach of the covenant does not affect that implied finding.

Although there is evidence to support an award of damages in some amount, it does not support an award of $279,428. But as City points out, the entire award was ultimately eliminated from the judgment when the trial court reduced the award by $279,428. The resulting judgment reflects only the FCA and CFCA penalties and nothing for breach of the covenant of good faith and fair dealing. Therefore, although there is insufficient evidence to

support an award for breach of the covenant of good faith and fair dealing in the full amount of $279,428, Thompson suffered no prejudice because the final judgment does not include any amount for that breach.[5]

## C. *Amending the Cross-complaint*

### 1. Background

The CFCA imposes liability on any person who, among other things, "[k]nowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval." (Gov. Code, § 12651, subd. (a)(1).) The act provides for treble damages and a civil penalty of up to $10,000 for each false claim. (*Id.*, subd. (a).) Either the government or an individual may bring a civil action for damages and penalties against anyone violating the CFCA. (Gov. Code, § 12652.)

Just prior to trial City filed a request seeking leave to amend the cross-complaint to add six causes of action for violation of the CFCA. According to City, it acquired the information necessary to plead those causes of action late in the discovery phase of the case. Thompson had failed to produce documents City sought in connection with its FPA cause of action and, therefore, City subpoenaed the information directly from the subcontractors involved in the FPA claims. The documents obtained through those subpoenas suggested that Thompson had paid its subcontractors less than the amount shown in the bid without adjusting the amount it demanded from City. City did not obtain these documents until just a few weeks before trial was set to begin. In addition, City deposed Peter Thompson, Thompson's president, on September 15, 2005, just days before trial was to start. Peter Thompson admitted that, in what he claimed was something of a cleaning frenzy, he had inadvertently directed the destruction or disposal of many documents pertaining to the project.

City filed its request for leave to amend on September 30, 2005, although it had alerted Thompson to its intention to do so at least two weeks earlier. The hearing was held October 5, 2005, with jury selection set to begin the next day. The trial court was plainly concerned about amending the cross-complaint on the eve of trial. The court asked the parties why Peter Thompson's deposition was taken so late in the process and City replied that

---

[5] Because we find there was no evidence that the damages awarded were caused by breach of the covenant of good faith and fair dealing, we do not reach Thompson's alternative argument that the supporting evidence, the Unilateral Contract Closeout Document (exhibit No. N-21), was inadmissible.

Thompson had delayed producing him. Thompson did not refute that representation. The court also observed that adding the new claims raised the potential for treble damages, which the court assumed was a concern for Thompson. The court queried Thompson about how it would be prejudiced. Thompson's only response was that, since the amendment was being offered on the eve of trial, Thompson could not call witnesses to defend the new claims since the time for subpoenaing witnesses had passed. The court replied that such prejudice could be cured by continuing the trial but Thompson's counsel responded, "Thompson Pacific has no interest in continuing the trial date at this point, your Honor." The court confirmed that Thompson would not want a continuance even if the court granted City leave to amend the cross-complaint:

"The Court: So you are not requesting for a continuance?

"[Counsel for Thompson]: We are not requesting a continuance at this time, Your Honor.

"The Court: Okay . . . the Court intends on granting the motion to amend and offer plaintiff a continuance to prepare to meet those—to meet amendments. And [counsel], so you, again you're not requesting the continuance; is that correct?

"[Counsel for Thompson]: That's correct, Your Honor."

### 2. Granting Leave to Amend

"An application to amend a pleading is addressed to the trial judge's sound discretion. [Citation.] On appeal the trial court's ruling will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.] The burden is on the [appellant] to demonstrate that the trial court abused its discretion." (*Sullivan v. City of Sacramento* (1987) 190 Cal.App.3d 1070, 1081 [235 Cal.Rptr. 844].)

 Code of Civil Procedure section 473, which gives the courts power to permit amendments in furtherance of justice, has received a very liberal interpretation by the courts of this state. (*Klopstock v. Superior Court* (1941) 17 Cal.2d 13, 19 [108 P.2d 906]; *Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 760 [135 Cal.Rptr.2d 433].) In spite of this policy of liberality, a court may deny a good amendment in proper form where there is unwarranted delay in presenting it. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 [86 Cal.Rptr.2d 547]; accord, *Yee v. Mobilehome Park Rental Review Bd.* (1998) 62 Cal.App.4th 1409, 1428–1429 [73 Cal.Rptr.2d 227]; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 475, 486–487 [55 Cal.Rptr.2d 225].)

On the other hand, where there is no prejudice to the adverse party, it may be an abuse of discretion to deny leave to amend. (*Atkinson v. Elk Corp., supra,* 109 Cal.App.4th at p. 761.)

On the question of prejudice, Thompson does not contend that the timing of the amendment prejudiced its ability to defend the newly added causes of action. Rather, Thompson maintains that the fraud allegations incorporated by the CFCA claims permitted the introduction of evidence that cast Thompson in a negative light, thereby contributing to the jury's verdict against it on the bad faith cause of action. Thompson did not make the argument in the trial court, where that potential for prejudice might have been mitigated. Appellate courts will not ordinarily consider matters raised for the first time on appeal. (*Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 5 [97 Cal.Rptr. 431].) In any event, since the jury's verdict on the bad faith cause of action did not result in a judgment for damages, the evidence of conduct pertaining to the newly added causes of action was not prejudicial. (Cal. Const., art. VI, § 13.)

Thompson also argues that City's delay was inexcusable because, with respect to three of the six new causes of action, City must have been aware of the relevant facts before it filed its cross-complaint. As to all the CFCA claims, however, it was necessary to plead, with particularity, that Thompson had actual knowledge of the falsity of the claim presented, acted in deliberate ignorance of its truth or falsity, or acted in reckless disregard of its truth or falsity. (Gov. Code, §§ 12651, subd. (a)(1), 12650, subd. (b)(2); *City of Pomona v. Superior Court* (2001) 89 Cal.App.4th 793, 801, 803 [107 Cal.Rptr.2d 710].) It was the late acquisition of documents from some of the subcontractors, and Peter Thompson's deposition taken a few weeks prior to trial, that gave City evidence to support the element of intent. Thompson does not dispute that it failed to produce the documents itself or that it was responsible for the late date of Peter Thompson's deposition. Accordingly, City cannot be faulted for the delay. In short, Thompson has not established that the trial court's ruling was an abuse of discretion.

### 3. Overruling the Demurrer

Thompson's argument pertaining to the demurrer is also unavailing. Thompson refused a continuance and insisted upon proceeding to trial. In so doing, Thompson treated the amended cross-complaint as being at issue and consented to trial of its factual allegations. (Cf. *Miklauschutz v. Superior Court* (1911) 16 Cal.App. 226, 227 [116 P. 376].) Then, while the trial was underway, Thompson filed a demurrer challenging the newly added causes of action on grounds they failed to state facts sufficient to constitute a cause of action and were uncertain. (See Code Civ. Proc., §§ 430.50, 589, subd. (a).)

Once trial has begun, however, the manner by which one tests the legal sufficiency of the adverse party's pleading is by a motion for judgment on the pleadings. (*Id.*, § 438.) Thompson could have accepted the court's offer of a continuance and filed its demurrer before the trial started or it could have proceeded to trial and tested the pleading with a motion for judgment on the pleadings. Thompson did neither. Accordingly, the trial court did not err by refusing to consider the merits of the demurrer.

### D. *Jury Instruction Defining "False Claim"*

#### 1. Background

Since there are no pattern instructions for CFCA claims, the trial court gave instructions taken from the language of the statute. Quoting Government Code section 12651,[6] the trial court explained that a person would be liable for damages under the CFCA if the person "(1) Knowingly presents or causes to be presented to an officer or employee of the City, a false claim for payment or approval. [¶] (2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the City." The instructions defined "person," "knowingly," and "claim" using the language of Government Code section 12650,[7] but did not define the word "false." Indeed, "false" is not defined in the statute.

The parties collaborated in drafting these instructions and the record does not show that Thompson made any objection to the false claims instructions other than to argue for the addition of the following special instruction, which the trial court refused to give.

"1. For a demand or request to be false, it must be a lie.

---

[6] Government Code section 12651 reads, in pertinent part, as follows:

"(a) Any person who commits any of the following acts shall be liable to the state or to the political subdivision for three times the amount of damages which the state or the political subdivision sustains because of the act of that person. A person who commits any of the following acts shall also be liable to the state or to the political subdivision for the costs of a civil action brought to recover any of those penalties or damages, and may be liable to the state or political subdivision for a civil penalty of up to ten thousand dollars ($10,000) for each false claim:

"(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false claim for payment or approval.

"(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision."

[7] Government Code section 12650 reads, in pertinent part, as follows:

"(a) This article shall be known and may be cited as the False Claims Act.

"(b) For purposes of this article:

"(1) 'Claim' includes any request or demand for money, property, or services made to any employee, officer, or agent of the state or of any political subdivision, or to any contractor,

"2. A demand or request that reflects differing opinions or misinterpretations of a contract is not false.

"3. Knowing a demand or request is false means that the person, when presenting it, did so with actual knowledge the information was false; in deliberate ignorance of the truth or falsity of the information; or in reckless disregard of the truth or falsity of the information.

"4. Faulty calculations, mistakes, errors, flawed reasoning, negligence, or differences in interpretation are not false."

Thompson argues that the trial court erred in refusing this instruction. Thompson maintains that in the context of the CFCA, the word "false" means "a lie" and, absent the clarification contained in this special instruction, the jury might have been misled into believing that a claim made in good faith could be considered a false claim. We agree with City that the word "false" has no special meaning and that Thompson's concern is really related to the mental state necessary for liability under the CFCA, an element that was adequately explained in the instructions that were given.

## 2. Legal Principles and Standard of Review

"It is, of course, axiomatic that a party is entitled to have the jury instructed as to his theory of the case provided (1) that he requests and submits legally correct instructions, and (2) that there is sufficient evidence to support the theory." (*Bains v. Western Pacific R.R. Co.* (1976) 56 Cal.App.3d 902, 905 [128 Cal.Rptr. 778].) On the other hand, where the jury is instructed in the language of the pertinent statute, and that language is " 'plain and concise' " and not "couched in legal verbiage that is baffling to a juror" the giving of explanatory or specific instructions as to the legal effect of the wording used is not mandatory. (*Reilly v. California Street Cable R. R. Co.*

grantee, or other recipient, whether under contract or not, if any portion of the money, property, or services requested or demanded issued from, or was provided by, the state (hereinafter 'state funds') or by any political subdivision thereof (hereinafter 'political subdivision funds').

"(2) 'Knowing' and 'knowingly' mean that a person, with respect to information, does any of the following:

"(A) Has actual knowledge of the information.

"(B) Acts in deliberate ignorance of the truth or falsity of the information.

"(C) Acts in reckless disregard of the truth or falsity of the information.

"Proof of specific intent to defraud is not required. [¶] . . . [¶]

"(4) 'Prosecuting authority' refers to the county counsel, city attorney, or other local government official charged with investigating, filing, and conducting civil legal proceedings on behalf of, or in the name of, a particular political subdivision.

"(5) 'Person' includes any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust."

(1946) 76 Cal.App.2d 620, 629 [173 P.2d 872].) "Instructions based on code provisions should follow the wording of the particular section involved, and when confusing or couched in legal terms should be explained, but when the language of the section is unambiguous and clearly stated without legal embellishments, no explanatory instructions are necessary." (*Ibid.*) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] Thus, . . . terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance." (*People v. Estrada* (1995) 11 Cal.4th 568, 574–575 [46 Cal.Rptr.2d 586, 904 P.2d 1197].) " 'It should be unnecessary to say that there is no law requiring the court to repeat an instruction once given or to amplify unnecessarily upon propositions which to a jury of ordinary intelligence would be apparent from the instructions given.' " (*Reilly v. California Street Cable R.R. Co.*, *supra*, 76 Cal.App.2d at p. 630.)

Our task, therefore, is to determine whether Thompson's proposed instruction was legally correct. This is a legal question to which we apply our independent review. (*Ghirardo v. Antonioli*, *supra*, 8 Cal.4th at p. 801.)

### 3. Analysis

As one California court has observed, "the term 'false claim' employs ordinary English words. It has no technical meaning." (*LeVine v. Weis* (2001) 90 Cal.App.4th 201, 212 [108 Cal.Rptr.2d 562], disapproved on other grounds in *Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1197 [48 Cal.Rptr.3d 108, 141 P.3d 225].) Nevertheless, Thompson maintains that the federal courts have held that "false" as it is used in connection with the federal False Claims Act (31 U.S.C. § 3729) (FCA), means "a lie." For our purposes the federal act is indistinguishable from the CFCA.[8] Accordingly, it is appropriate to consult federal authority. (Cf. *City of Pomona v.*

---

[8] In pertinent part, the FCA provides as follows:

"(a) Liability for certain acts.—Any person who—

"(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

"(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [¶] . . . [¶]

"(b) Knowing and knowingly defined.—For purposes of this section, the terms 'knowing' and 'knowingly' mean that a person, with respect to information—

"(1) has actual knowledge of the information;

"(2) acts in deliberate ignorance of the truth or falsity of the information; or

"(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." (31 U.S.C. § 3729.)

*Superior Court, supra,* 89 Cal.App.4th at p. 802.) A careful reading of the cases Thompson cites shows, however, that the federal court did not purport to define the word "false" but stressed that the mental state required by the statute was something other than a good faith error. (See *Wang v. FMC Corp.* (9th Cir. 1992) 975 F.2d 1412 *(Wang)*; *U.S. ex rel. Anderson v. Northern Telecom, Inc.* (9th Cir. 1995) 52 F.3d 810, 815; *Hagood v. Sonoma County Water Agency* (9th Cir. 1996) 81 F.3d 1465, 1478.) For example, *Wang* explained that a plaintiff cannot prove a violation of the FCA simply by showing that the defendant's work was of low quality. "Without more, the common failings of engineers and other scientists are not culpable under the [FCA]." *(Wang, supra,* 975 F.2d at p. 1421.) The FCA requires the presentation of what is known to be false. *(Ibid.)* "The phrase 'known to be false' in that sentence does not mean 'scientifically untrue'; it means 'a lie.' The [FCA] is concerned with ferreting out 'wrongdoing,' not scientific errors. [Citation.] What is false as a matter of science is not, by that very fact, wrong as a matter of morals." *(Ibid.)*

The federal courts have made it clear that the language in *Wang* and other such cases must not be read to mean that liability under the FCA requires a deliberate lie. "The False Claims Act imposes liability only on those who 'knowingly' present a 'false or fraudulent claim' to the government. *See* 31 U.S.C. § 3729(a)(1). Mere negligence and 'innocent mistake[s]' are not sufficient to establish liability under the FCA. [Citation.] While some of our cases may contain extraneous comments that might be read out of context to suggest that the FCA requires an intentional lie to trigger liability, those cases almost invariably reiterate the controlling statutory language that is determinative of their outcome. As the FCA provides, to rise to the level of 'knowing' presentation, all that is required is that the party: [¶] (1) has actual knowledge of the information; [¶] (2) acts in deliberate ignorance of the truth or falsity of the information; or [¶] (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required. [¶] 31 U.S.C. § 3729(b). We have repeatedly emphasized this statutory language when describing the scienter requirement under the FCA. *See, e.g., Hagood v. Sonoma County Water Agency,* 81 F.3d 1465, 1478 (9th Cir. 1996); *Wang v. FMC Corp.,* 975 F.2d 1412, 1420 (9th Cir. 1992); *United States ex rel. Hagood v. Sonoma County Water Agency,* 929 F.2d 1416, 1421 (9th Cir. 1991). Thus, in order to be liable for an FCA violation, [the defendant's] conduct need only qualify under one of the alternative statutory standards, such as 'deliberate ignorance' or 'reckless disregard.' " *(U.S. ex rel. Plumbers & Steam. v. C.W. Roen Const.* (9th Cir. 1999) 183 F.3d 1088, 1092–1093.)

■ The CFCA contains the same scienter requirements as the federal law. The CFCA does not demand a deliberate lie but allows for liability where the defendant acts in deliberate ignorance or in reckless disregard of

the truth of the claim. (Gov. Code, § 12650.) Thus, the first, second, and fourth paragraphs of Thompson's instruction are inaccurate statements of the law. The third paragraph merely repeats the instruction the trial court gave, which was that a person is liable only for "knowingly" making a false claim and that "knowingly" means that the person "(A) Has actual knowledge of the information. [¶] (B) Acts in deliberate ignorance of the truth or falsity of the information. [¶] (C) Acts in reckless disregard of the truth or falsity of the information. [¶] Proof of specific intent to defraud is not required."

What Thompson wanted to stress was that the innocent presentation of a mistaken claim would not be sufficient to trigger liability under the CFCA. It is true, as Thompson points out, that the court's instruction on the meaning of "false claim" was actually incorrect. That instruction was, "A false claim within the meaning of this instruction includes any request or demand for money, property, or services made to any employee, officer or agent of the City." The instruction was obviously intended to define the term "claim" and not "false claim." But no reasonable jury would have been misled by this mistake into believing that *any* claim for payment would be considered a false claim, particularly in light of the other instructions. Those instructions, focusing as they did upon the person's deliberate or reckless disregard of the truth or falsity of the claim, plainly excluded innocent, good faith misunderstandings.

Since Thompson's proposed instruction contained inaccurate statements of the law and added nothing to the trial court's instructions, the trial court did not err in refusing it.

### E. *Special Verdict Form*

Thompson next argues that the special verdict form was insufficient in that it did not ask the jury to make a finding of materiality, i.e., that the alleged false claim "had a natural tendency to influence the City's action or was capable of influencing the City's action." City maintains that Thompson waived the argument. City is correct.

Thompson claims that the special verdict was used over its objection but the only objection Thompson made was to the form's failure to require the jury to specify which claims, if any, it found to be false. There is no indication that Thompson objected to the form for its failure to require a finding on the materiality element. As a result, the issue was waived. (See *Heppler v. J.M. Peters Co.* (1999) 73 Cal.App.4th 1265, 1287 [87 Cal.Rptr.2d 497] [claim that special verdict form did not adequately address defendant's negligence was waived when plaintiffs failed to submit special verdict form addressing the alleged negligence]; see also Cal. Rules of Court, rule 3.1580

[party requesting special findings by jury must "present to the judge in writing the issues or questions of fact on which the findings are requested"].)

### F. *Jury Instruction on Breach of Warranty of Correctness*

Part of Thompson's breach of contract claim was that City had breached the implied warranty of correctness by providing plans and specifications that did not include dimensions for certain structural steel members. This alleged omission caused the metal fabricator to request clarification and, according to Thompson, City's failure to promptly provide the clarification caused a four-month delay in completing the project.

Courts have recognized a cause of action in contract against a public entity based upon the theory that "the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." (*Souza & McCue Constr. Co. v. Superior Court* (1962) 57 Cal.2d 508, 510–511 [20 Cal.Rptr. 634, 370 P.2d 338].) "A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented." (*Id.* at p. 510.) In order to recover on such an action, the contractor must prove that the agency affirmatively misrepresented, or actively concealed, material facts which rendered the bid documents misleading, and that the contractor reasonably relied on such misrepresentations in preparing its bid. (*Jasper Construction, Inc. v. Foothill Junior College Dist.* (1979) 91 Cal.App.3d 1, 10 [153 Cal.Rptr. 767].) Affirmative misrepresentation or concealment is required to avoid burdening public entities "with liability where the contractor underbids due to lack of diligence in examining specifications and plans which are themselves accurate." (*Ibid.*)

Consistent with *Jasper*, the trial court instructed the jury that, in order to recover on its implied warranty theory, Thompson had to prove "[t]hat there was an affirmative misrepresentation or concealment of material fact(s) in the plans and specifications at the time of bid" upon which Thompson reasonably relied in submitting the bid and that Thompson incurred extra work or expenses caused by "conditions being other than as represented."[9]

Thompson argues that the instruction was erroneous because *Jasper* is not good law. According to Thompson, *Welch v. State of California* (1983)

---

[9] The full instruction was as follows:

"A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authority as the basis for bids and who, as a result, submits

139 Cal.App.3d 546, 556 [188 Cal.Rptr. 726] (*Welch*) held that "there is no requirement of proving an affirmative fraudulent intent to conceal." *Welch* did clarify that a cause of action relying upon nondisclosure may arise where, " '(1) the defendant makes representations but does not disclose facts which materially qualify the facts disclosed, or which render his disclosure likely to mislead; (2) the facts are known or accessible only to defendant, and defendant knows they are not known to or reasonably discoverable by the plaintiff; [or] (3) the defendant actively conceals discovery from the plaintiff.' " (*Id.* at pp. 555–556, quoting *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 294 [85 Cal.Rptr. 444, 466 P.2d 996].) But this does not mean, as Thompson maintains, that City could be liable simply by failing to supply complete plans and specifications. It does mean that careless failure to disclose information may form the basis for an implied warranty claim if the defendant possesses superior knowledge inaccessible to the contractor or where that which was disclosed is likely to mislead in the absence of the undisclosed information. (*Welch, supra,* 139 Cal.App.3d at p. 556.) Thus, *Welch* is consistent with the general rule that silence alone is not actionable. (*Wiechmann Engineers v. State of California ex rel. Dept. Pub. Wks.* (1973) 31 Cal.App.3d 741, 751 [107 Cal.Rptr. 529].)

 That said, to the extent *Welch* permits a finding of breach in the absence of active concealment, there was no evidence in this case to support an instruction to that effect. In any event, Thompson did not request an instruction in the language of *Welch.* "In order to complain of failure to instruct on a particular issue the aggrieved party must request the specific proper instructions." (*Hyatt v. Sierra Boat Co.* (1978) 79 Cal.App.3d 325, 335 [145 Cal.Rptr. 47].)

The instruction that Thompson did request is the following: "[City] had a duty to provide adequate plans and specifications. [Thompson] had no responsibility for the adequacy of [City's] plans and specifications, nor any duty to supplement any inadequacy of those plans and specifications." The instruction is taken from section 1104, added by the Legislature in 1999, which specifies, "No local public entity . . . shall require a bidder to assume

a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented.

"In order to recover damages against [City] for breach of the implied warranty for the plans and specification, [Thompson] must prove all of the following:

"1. That there was an affirmative misrepresentation or concealment of material fact(s) in the plans and specifications at the time of bid; and

"2. That [Thompson] reasonably relied on the affirmative misrepresentation or concealment of material fact(s) when it submitted its bid for the [project]; and

"3. That [Thompson] incurred extra work or expenses necessitated by the conditions being other than as represented."

responsibility for the completeness and accuracy of architectural or engineering plans and specifications on public works projects, except on clearly designated design build projects. . . ." According to Thompson, section 1104 also shows that *Jasper* is no longer good law and that under section 1104 City may be in breach of the implied warranty of correctness simply by failing to supply complete plans and specifications. Thompson misreads section 1104. Section 1104 prevents the public entity from placing the risk of accuracy and completeness of the plans and specifications upon the contractor. It says nothing about the contractor's burden to prove that the public entity breached the warranty.

The court's duty to instruct the jury is discharged if its instructions embrace all points of law necessary to a decision. (*Hyatt v. Sierra Boat Co.*, *supra*, 79 Cal.App.3d at p. 335.) A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not complain if the court correctly gives the substance of the applicable law. (*Id.* at p. 336.) In light of the evidence presented at trial, the trial court's instruction correctly gave the substance of the law as set forth in *Jasper*. Accordingly, the court did not err in refusing Thompson's additional instruction.

### G. *Evidentiary Rulings*

Thompson argues that the trial court erred in permitting City to elicit evidence of Thompson's destruction of documents relating to the subcontractors that worked on the project but who had not been listed on Thompson's bid. Thompson also complains that evidence that subcontractor Fife Metal Fabricating did not pay prevailing wages to employees in Massachusetts was irrelevant. The error, if there was any, did not result in any miscarriage of justice. (Cal. Const., art. VI, § 13.) The only prejudice Thompson claims to have suffered as a result of these evidentiary rulings is that the evidence allowed City to argue that Thompson was a bad contractor that did not act in good faith, thereby indirectly bolstering City's claim for breach of the covenant of good faith and fair dealing. Since Thompson suffered no damages as a result of the jury's verdict on the breach of the covenant cause of action, introduction of this evidence did not ultimately result in prejudice.

### H. *Thompson's Damages*

Thompson next contends that the jury awarded it inadequate damages. Indeed, the jury did not award Thompson any damages.

Thompson argues that there was undisputed evidence that it had performed extra work valued at $25,488.63 and, therefore, the verdict of zero is inadequate as a matter of law. We disagree. *Smith v. Covell* (1980) 100

Cal.App.3d 947 [161 Cal.Rptr. 377], upon which Thompson relies, is distinguishable. In that case the defendant had admitted liability in connection with an automobile accident and the jury awarded damages to the plaintiff for her physical injuries but gave the plaintiff's husband nothing for his loss of consortium where there was uncontroverted evidence of the loss. Here City did not admit liability. Indeed, the jury found in favor of City on both of Thompson's causes of action. Given the jury's verdict, there was no basis for an award of damages to Thompson.

## I. Attorney Fees

### 1. Background

Thompson's complaint contained two causes of action—one for breach of contract, the other for violation of section 7107. Section 7107 requires a public entity to release any retention within 60 days of completion of the project. (§ 7107, subd. (c).) In the event of a dispute, the public entity may retain 150 percent of the disputed amount, pending resolution of the dispute. (*Ibid.*) If retention payments are not made within the time required the public entity "shall be subject to a charge of 2 percent per month on the improperly withheld amount" and "in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to attorney's fees and costs." (*Id.*, subd. (f).) Following trial, City moved for an award of attorney fees under section 7107.

City first requested $620,532.40, which was more than 90 percent of all the fees City had incurred in the course of the litigation. Thompson opposed the request arguing that there were only three elements to the section 7107 claim: "Did the City withhold contract retention more than 60 days after it was due, did the amount withheld exceed 150 percent of the estimated value of the disputed amount and was there a good faith dispute regarding the amount withheld." Counsel maintained that those three elements were not related to Thompson's extra work claims or City's CFCA or FPA causes of action. After hearing that argument, the trial court turned to City's counsel and asked counsel to "segregate what [Thompson's counsel] was talking about. Yes, it's correct that to the extent that issues or facts are overlapping and cannot be segregated, then the City is entitled to recover attorney's fees. But just cursorily, I can see that many items can be segregated. So I would like you to submit another statement." The court also asked City to "take a look at reducing the attorney's fees" for the two associates who were present at trial along with the lead trial attorney. City then cut the original request by nearly 40 percent, responding with a request for fees of $377,799. The trial court accepted the amount, finding that it was reasonable.

Thompson argues that the fee award was unjustified because it includes fees for work not directly related to the section 7107 claim, it improperly awards fees where there was no finding its suit was frivolous, and the amount of the award is unreasonable.

## 2. Allocation

Thompson maintains that the fees for defense of the section 7107 claim are easily segregated by reference to the items in City's billing statements, some of which specifically refer to section 7107. According to Thompson, the total of the items specifically referring to section 7107 is $7,765, which Thompson maintains is sufficient and proportionate to the $58,994 it claimed under section 7107. City responds that reference to section 7107 in some of the attorneys' time entries does not preclude a finding that other entries were also related to section 7107.

■ *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 [158 Cal.Rptr. 1, 599 P.2d 83], which involved a claim for fees under Civil Code section 1717, held as follows: "Where a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action." The court clarified that fees need not be apportioned "when incurred for representation on an issue common to both a cause of action in which fees are proper and one in which they are not allowed. All expenses incurred with respect to the [issues common to all causes of action] qualify for award." (*Reynolds Metals Co.*, at pp. 129–130.) Thus, allocation is not required when the issues are "so interrelated that it would have been impossible to separate them into claims for which attorney fees are properly awarded and claims for which they are not." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1133 [94 Cal.Rptr.2d 448].)

■ Where fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion. (*Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073, 1083 [25 Cal.Rptr.3d 39].) A trial court's exercise of discretion is abused only when its ruling " ' " 'exceeds the bounds of reason, all of the circumstances before it being considered.' " ' " (*San Dieguito Partnership v. San Dieguito River Valley Regional etc. Authority* (1998) 61 Cal.App.4th 910, 920 [72 Cal.Rptr.2d 91], disapproved on another point in *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084 [95 Cal.Rptr.2d 198, 997 P.2d 511].)

■ It is true, as Thompson argues, that a court may not award fees for legal work that is unrelated to a cause of action for which fees are authorized.

(*Reynolds Metals Co. v. Alperson, supra,* 25 Cal.3d at p. 130.) That was the situation in *Sweeney v. McClaran* (1976) 58 Cal.App.3d 824, 830 [130 Cal.Rptr. 205], upon which Thompson relies, where fees for legal work related to a claim in interpleader were clearly separable by time from fees incurred before the interpleader cause of action was added. In this case, the trial court did not purport to allow fees for work unrelated to the retention cause of action. The trial court specifically asked City to separate out the fees related to Thompson's claim for extra work and City's CFCA and FPA causes of action.

Thompson concedes that the section 7107 claim was related to City's breach of contract cause of action. Indeed, City's contract cause of action incorporated the very disputes that led it to delay release of the full retention. The section 7107 claim was also related to Thompson's breach of contract claim against City. City's successful defense of the section 7107 cause of action required proof of a good faith dispute that warranted withholding the money. This same proof was a necessary predicate to defense of Thompson's breach of contract cause of action, which alleged, among other things, that City had failed to pay for work performed, purposefully delayed the project, and failed to pay interest on improperly withheld payments.

The trial court, having heard the entire case, was in the best position to determine whether any further allocation of attorney fees was required or whether the issues were so intertwined that allocation would be impossible. (*Akins v. Enterprise Rent-A-Car Co., supra,* 79 Cal.App.4th at p. 1133.) Having impliedly concluded that there was no precise methodology by which it could further apportion the fee request (see *Nazemi v. Tseng* (1992) 5 Cal.App.4th 1633, 1642 [7 Cal.Rptr.2d 762]), the trial court acted within its discretion in awarding fees of $377,799.

### 3. Awarding Fees Against a Contractor

Thompson contends that the intent of section 7107 is to advance the public policy favoring prompt payment of a contractor's retention. According to Thompson, awarding fees to the party seeking to recover retained funds advances that purpose, awarding fees to the party withholding the funds does not. Thompson maintains, therefore, that, in order to obtain a fee award under section 7107, a defending public entity must show that the contractor's action to recover the funds was frivolous. Thompson looks for support to *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383 [15 Cal.Rptr.2d 53], which held that attorney fee awards to defendants in employment discrimination cases " 'should be permitted "not routinely, not simply because he succeeds, but only where the action brought is found to be unreasonable, frivolous, meritless or vexatious." ' " (*Id.* at p. 1387, quoting

*Christianburg Garment Co. v. EEOC* (1978) 434 U.S. 412, 421 [54 L.Ed.2d 648, 98 S.Ct. 694] (*Christianburg Garment*).) These cases are distinguishable.

 *Christianburg Garment, supra,* 434 U.S. 412, concerned former section 706(k) of title VII of the Civil Rights Act of 1964, which provided: "In any action or proceeding under this title the court, *in its discretion, may allow* the prevailing party, . . . a reasonable attorney's fee as part of the costs . . . ." (78 Stat. 261, 42 U.S.C. former § 2000e-5(k), italics added.) *Cummings* involved Government Code section 12965, which reads, in pertinent part: "In actions brought under this section, the court, *in its discretion, may award* to the prevailing party reasonable attorney's fees and costs . . . ." (Gov. Code, § 12965, subd. (b), italics added.) That is, the statutory provisions at issue in *Christianburg Garment* and *Cummings* left the award of fees to the trial court's discretion. In contrast, section 7107 makes the award mandatory in that it provides that "in any action for the collection of funds wrongfully withheld, the prevailing party *shall be entitled* to attorney's fees and costs." (§ 7107, subd. (f); see *People v. Standish* (2006) 38 Cal.4th 858, 869 [43 Cal.Rptr.3d 785, 135 P.3d 32] [presumption is that the word "shall" in a statute is ordinarily deemed mandatory].) Given the mandatory language of the statute, the trial court had no discretion to refuse to award fees to a prevailing party.

### 4. Reasonableness

Thompson's final argument is that it was "beyond the bounds of reason to award $377,799 of attorney fees to defend against a $58,994 claim."

 Where fees are authorized by statute, the amount of the fee to be awarded is to be determined by the trial court in the reasonable exercise of its discretion. (*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.* (1997) 53 Cal.App.4th 152, 169 [61 Cal.Rptr.2d 715].) The trial judge is in the best position to evaluate the services rendered and the court's decision will not be disturbed on appeal unless it is clearly wrong. (*City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78, 85 [249 Cal.Rptr. 606].) The trial court, which possesses its own expertise on the value of legal services performed, makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case. (*PLCM Group, Inc. v. Drexler, supra,* 22 Cal.4th at p. 1096.) The trial court carefully reviewed City's first request for fees and, after the court instructed City to make an appropriate apportionment to exclude fees related to Thompson's claim for extra work and City's FPA and CFCA causes of action, City returned with a drastically

reduced claim. Thompson gives us no reason to doubt that the trial court further exercised its discretion in concluding that the second claim was reasonable.

## IV. Disposition

The judgment is modified to strike the penalty of $91,067.09 for violation of the Subletting and Subcontracting Fair Practices Act (§ 4100 et seq.). As modified, the judgment is affirmed.

The parties shall bear their own costs on appeal.

Rushing, P. J., and Elia, J., concurred.