Filed 3/19/14  Chen v. Sutherland CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| XUEMEI CHEN et al.,<br><br>      Plaintiffs and Respondents,<br><br>      v.<br><br>RICHARD R. SUTHERLAND,<br><br>      Defendant, Cross-complainant and Appellant;<br><br>THOMAS E. FRANCIS,<br><br>      Defendant, Cross-defendant and Respondent. | H037956<br>(Santa Clara County<br>Super. Ct. No. CV133580) |

## I.  INTRODUCTION

Respondents Xuemei Chen, Cheong Ang, and Richard C. Conroy invested a total of $474,000 in an investment scheme involving the purchase and sale of heavy equipment.  After losing nearly all of their money, respondents filed a lawsuit against Katherine K. Sutherland, M.D. (Katherine)[1] and her husband, appellant Richard R. Sutherland (Richard), who respondents believed had induced them to participate in the

---

[1] We will hereafter refer to appellant Katherine Sutherland and her husband, Richard Sutherland, by their first names for purposes of clarity and meaning no disrespect.

fraudulent investment scheme and were therefore responsible for their losses under contract and tort theories of liability. Respondents also named as a defendant Thomas E. Francis, M.D., who was involved in the fraudulent investment scheme.

During the three-week jury trial, Richard dismissed his cross-complaint against Francis, in which he had sought indemnification, apportionment of fault, declaratory relief, and damages. The jury found that Katherine had no liability, that Richard and Francis were partners, and that Richard and Francis were liable to respondents for compensatory damages. The judgment entered in December 2011 awarded respondents Chen and Ang the total amount of $546,394.66 and respondent Conroy the total amount of $116,103.29.

On appeal, Richard contends that the judgment should be reversed because the trial court erred in (1) admitting evidence of Richard's dismissed felony convictions in violation of Penal Code section 1203.4 and Evidence Code section 788, subdivision (c); (2) refusing the jury instructions proposed by Richard on causation, agency, and partnership; and (3) denying Richard's Code of Civil Procedure section 473, subdivision (b) motion for relief from his voluntary dismissal of his cross-complaint for indemnification against Francis. For the reasons stated below, we find no merit in Richard's contentions and therefore we will affirm the judgment.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Pleadings

In 2009, plaintiffs Chen, Ang, and Conroy filed a complaint against defendants Richard, Katherine, and Francis.[2] The parties' trial briefs indicate that the causes of action that remained for trial against all three defendants were fraud and deceit, negligent

---

[2] The complaint also named several other defendants who were not involved in the trial and are not involved in the present appeal.

misrepresentation, unjust enrichment, and rescission. As against Richard and Francis only, causes of action remained for breach of contract and common count for money lent.

Richard filed a cross-complaint against Francis in 2010. By the time of trial, the operative pleading was the second amended cross-complaint,[3] which sought indemnification, apportionment of fault, and declaratory relief, and also stated causes of action for breach of contract and rescission.

### B. Trial Evidence

The trial on the complaint and the second amended cross-complaint began on November 15, 2011. The following is a summary of the witness testimony and other evidence presented at trial.[4]

### 1. Chen and Ang Meet the Sutherlands

In March 2008, Chen, a data analyst, and Ang, a software engineer, moved to a house in Los Altos.[5] Richard and Katherine lived in a house across the street. Chen and Ang gave a housewarming party in May 2008 where they met their neighbors Richard and Katherine for the first time. During the housewarming party, Richard told Chen that "he was retired from [l]aw." Richard had actually been suspended from the practice of law by the California State Bar after suffering felony convictions for perjury, offering a forged document as genuine, and falsifying documents to be used as evidence.[6] Richard ultimately resigned from the California State Bar in 1997 with disciplinary charges

---

[3] The second amended cross-complaint was not included in the record on appeal.

[4] The record reflects that the trial testimony included the playing of the video deposition of Michael Lee Weaver, but the deposition was not transcribed and was not included in the record on appeal.

[5] Chen and Ang were married in August 2010.

[6] This court affirmed the judgment on Richard's felony convictions in *People v. Sutherland* (Feb. 8, 1999, H016872 [nonpub. opn.].)

3

pending that arose in a different matter. However, Richard understood that a 2001 court order had set aside his convictions after the trial court granted his application under Penal Code section 1203.4. He had also received legal advice that the court order meant he had no obligation to reveal that he had once been convicted of felony offenses.

Chen next met Richard and Katherine at a neighborhood block party on July 4, 2008. During her conversation with Richard, Chen asked him what he had been doing after retiring from law. Richard replied that he "had been doing some investments." Chen was interested because their "investments in the stock market were really bad." Richard responded that since he did not take any risks at his age he was investing in low risk investments, including viaticals[7] and "the Heavy Equipment Arbitrage Program."[8]

### 2. The Heavy Equipment Arbitrage Program

On July 12, 2008, Chen received an email from Richard regarding the heavy equipment arbitrage program. Chen forwarded the email to Ang. One paragraph in the email was entitled "Executive Summary—Jupiter Heavy Equipment Arbitrage Partners." Among other things, the Executive Summary stated that its principals were Richard and Francis and described Richard as a graduate of Harvard Law School who had 25 years of experience as a "successful business and real estate litigator." This description was intended by Richard "to create a sense of trust in [his] education, [his] business ability and [his] training."

The Executive Summary also included an explanation of the heavy equipment arbitrage program: "Large construction projects outside the United States are proceeding

---

[7] "A viatical is a sale of the life insurance policy of a terminally ill person to an investor so that the insured has money for support prior to death. When the insured dies, the investor receives a portion, or all, of the beneficiary proceeds of the policy." (*People v. Cole* (2007) 156 Cal.App.4th 452, 466, fn. 15.)

[8] Arbitrage transactions involve "[t]he simultaneous buying and selling of a given commodity to capitalize on a price differential." (*People v. Vineberg* (1981) 125 Cal.App.3d 127, 132-133.)

4

at a record pace, whether one is talking about China, India, Dubai, other parts of the Middle East or South and Central America.  The demand for heavy equipment to perform these tasks is virtually unprecedented.  Domestic but primarily foreign buyers search the globe for new and used heavy equipment to meet their needs.  Generally, the cost of a used piece of machinery normally runs between $100,000 and $500,000 per piece. . . . [¶] . . .  What happens is that an order for a particular machine, new or used, comes into our joint venture broker-dealer partner.  Our broker-dealer partner, with order in hand, then searches his sources in the United States for a machine with which to fill the order.  With the purchase order already in hand, our broker-dealer partner purchases the equipment for immediate resale to the foreign buyer.  The profit is the difference between the purchase price and the resale price of the equipment, realized when payment is received by the broker dealer. . . .  [¶]  The equipment is not shipped to the foreign buyer (or domestic buyer as the case may sometimes be), unless and until full payment therefor has been received by the broker-dealer partner and the funds deposited into a bank trust account."

The Executive Summary also described the risk of investing in the heavy equipment arbitrage program:  "There is a possibility that although an order has been placed for a particular piece of heavy equipment with the broker-dealer has subsequently used funds from Jupiter to purchase the equipment [*sic*], the buyer may default on the purchase.  In such an event, the broker-dealer would then set about to find a subsequent buyer for the piece of machinery.  The price at which the broker-dealer sells the equipment might be at a lower price or [it] may take longer to find a buyer. . . .  It is an extremely rare event for an order to be placed with the broker-dealer and to have the buyer default on the purchase after the broker-dealer had acquired the ordered piece of equipment.  There has been no default on any payment from the broker-dealer in four years of experience. . . .  The principal is in essence secured by the machinery which is owned free and clear of any liens and encumbrances."

5

Richard and Francis intentionally omitted the name of the Georgia broker-dealer, Wendell Spell, from the Executive Summary.

### 3.  The July 13, 2008 Meeting with the Sutherlands

On July 13, 2008, Chen and Ang met with Richard and Katherine to discuss investing in viaticals and the heavy equipment arbitrage program.[9] The meeting took place in the Sutherlands' home.  With regard to the heavy equipment arbitrage program, Richard explained that Francis, who was described in the Executive Summary as a principal, was located in Georgia, had been a friend of the Sutherlands for 30 years, and had introduced the heavy equipment arbitrage program to them.  Richard also explained how the program worked, stating that "[t]he machine ha[d] been sold before it was purchased" and the Georgia broker-dealer needed investors rather than bank credit to purchase the heavy equipment due to the speed of the transactions.  Jupiter Heavy Equipment Arbitrage Partners was a business that Richard and Francis were starting where investors would receive a fixed rate of 2 percent on their investments.  Richard also informed Chen and Ang that before the end of July 2008, when the Jupiter business would start, he and Francis were offering "ad hoc deals" with a much higher return than 2 percent.

As to risk, Richard stated during the July 13, 2008 meeting with Chen and Ang that their money invested in heavy equipment would be safe because Francis maintained a separate trust account for investors' funds.  Chen recalled that Richard also stated that the risk of investing in the heavy equipment arbitrage program was "very minimal, almost no risk, because the machine has been presold and that the worst case scenario is that the buyer disappeared or doesn't want to buy it anymore and we will be stuck with

---

[9] The parties disagreed during their trial testimony as to whether Katherine was present when Richard was describing the heavy equipment arbitrage program during the July 13, 2008 meeting.  Katherine testified that she had left the room before that discussion took place; Chen recalled that Katherine was present.

the piece of machine. Then we just have to find another buyer to sell it." Richard told Chen and Ang that he and Katherine had "invested a lot of money in the business as well," and that the Sutherlands had done "due diligence" by traveling to Georgia where they met Spell (the broker-dealer) and "saw the machines on the lot." By the time of the July 13, 2008 meeting, the investments that Richard and Katherine had made in the heavy equipment arbitrage program exceeded $700,000.

Chen trusted Richard and she and Ang left the meeting "feeling very lucky that [they could] be included in this kind of private opportunity. . . . We just felt like they have done all the work, all the preparation work and we kind of just to enjoy the ride or enjoy the benefits." They told Richard to let them know if anything came up.

### 4. Chen, Ang, and Conroy Decide to Invest

After their meeting, Richard sent Chen and Ang an email dated July 14, 2008, in which he stated that he had "left the stock market in 2000." Richard also stated: "So, now I keep it simple. I know who the players are. I mean, I really do know them. I know what the process is. I understand perfectly how the . . . heavy equipment operations work. I know and understand what the risks are, and they are among the least of anything I know, even banks. . . . [¶] [I] have a lot of family and friends who have invested with [Katherine] and me. But none have more money invested in these programs than do [Katherine] and I. We take these responsibilities very, very seriously. We look forward to helping you build a great fund to put your children through college and to live a pretty darned stress-free existence."

In another email dated July 14, 2008, Richard advised Chen that he had just gotten a call from his "partner, Tom [Francis], back in Georgia. Two orders for machines costing $87,000 have just come in. You can have one or both. The payout is 4.25% of the $87,000 in four weeks." Chen discussed the investment offer with Ang and with Conroy, her ex-husband and friend. Richard telephoned Conroy and told him that he had "checked out the operation" of the heavy equipment arbitrage program and that it "was a

partnership, it was low risk and that [his] money was safe." After deciding that the heavy equipment arbitrage program presented a good opportunity, Ang wired $87,000 to Francis and received a bill of sale from Francis that was stamped by Spell. Conroy also wired $87,000 to Francis and received a bill of sale from him.

The next investment opportunity was presented to Chen in Richard's July 18, 2008 email, which stated: "There is now a $428,000 contract available that pays 4.5% in 5 weeks. Some others have already pitched in to buy the machine. If you have any interest in coming in on the purchase of this machine, let me know and if so, how much?" Chen and Ang decided to invest $100,000 to purchase a fraction of the machine. Richard then sent Chen a memorandum dated July 18, 2008, in which he stated that in five weeks they would be paid 4.5 percent on their $100,000 investment, and could elect to have the principal returned to them or rolled over into another investment.

After making the $100,000 investment, Chen received a July 25, 2008 email from Richard stating that there was "a $310,000 contract available" with a return of 3.25 percent to 3.75 percent, depending on the time of the payoff. Richard also stated in the email, "Remember, the money isn't simply 'floating' out there. It is always connected directly to a specific machine. Also, if you have family or friends looking for a safe and better place to put some money, we welcome referrals."

Chen recalled that Richard periodically told her to give his name to family or friends who were interested in doing "sound investments." Richard also encouraged Chen and Ang to invest more in the heavy equipment arbitrage program by taking out a line of credit on their house. Richard and Francis profited on others' investments in the heavy equipment arbitrage program under the following arrangement: After the investor was paid his or her profit on the deal (as determined by Spell), Spell and Francis split the remaining gross profit and Francis, in turn, gave Richard one-half of Francis's profit.

Richard's role was to bring in the investors, present to them the deal offered by Francis (including the availability of a machine, the cost, the profit, and the timeframe),

8

write memoranda confirming the investors' purchases, and direct them to wire their money to Francis, who would then provide the investor with the bill of sale he had received from Spell. The investors' funds "passed through" Francis's checking account and "went directly to Mr. Spell's entities." Francis did not inspect the equipment and had no knowledge of the equipment's purchasers or whether the purchasers actually existed. Richard denied that he and Francis had ever formed a partnership. Francis acknowledged that he and Richard occasionally referred to each other as partners.

In August 2008, Richard offered Chen and Ang another investment opportunity. Specifically, Richard's August 6, 2008 email offered them "10% on $900,000 (or a portion thereof . . .), paid in 4 to 6 weeks." Because Chen and Ang had not yet received any return on their previous investments, they did not invest in that opportunity. They had previously made a third investment of $200,000 for an interest in machines with a price of $1.4 million. Richard confirmed the $200,000 investment in a memorandum dated August 7, 2008. The memorandum also stated that Chen and Ang would be paid a 10 percent return in six weeks and could elect to roll the principal into a new investment or have the principal returned. Richard advised them that they were responsible for paying the wire transfer fees to Francis. However, Richard admitted during his trial testimony that he never did anything to verify that the equipment that the investors were buying actually existed or to acquaint himself with standard practices in the used heavy equipment industry.

### 5. Standard Practices in the Used Heavy Equipment Industry

An expert on standard practices in the used heavy equipment industry, Jack Thomson, testified on behalf of plaintiffs. Thomson is the president of Thomson Equipment Company, which buys, sells, and rents used construction equipment. Thomson founded the company in 1985 and at the time of trial was president of the Independent Equipment Dealers Association.

9

Thomson explained his process for purchasing a used piece of construction equipment. First, if he is buying from a contractor, he needs to know the company name and the nature of the business, since some industries are harder on equipment than others. After determining the company name, Thomson performs a lien search, since, unlike a motor vehicle, construction equipment does not have a title. If the piece of equipment has a lien on it, Thomson has to pay off the lien.

Thomson is very careful when he purchases a piece of equipment at auction. He would not buy the equipment without a thorough inspection and verification of the prior owner, the usage, and the maintenance program. Thomson would also want to know the number of hours on the hour meter, which indicates the total number of hours a piece of equipment has run. Used construction equipment usually has a purchase price of $150,000 to $200,000 and can cost as much as $60,000 to repair.

Most of the used construction equipment that Thomson purchases is for resale. Sometimes it is purchased for resale to a specific buyer who needs a particular piece of equipment for a construction job. If Thomson does not know the buyer, he will investigate the buyer's financial condition and prior jobs in the construction industry before making the sale. In Thomson's experience with international sales, the transactions are handled through a freight forwarder in the United States who is sent a certified bill of sale, a commercial invoice, and a power of attorney or letter stating that the freight forwarder can act on the seller's behalf. The bills of sale that Thomson examined in this case could not have been used to document a foreign transaction since the serial numbers did not match the equipment.

Thomson reviewed the bill of sale that was provided to Chen and Ang for their $87,000 investment and noticed several discrepancies. The bill of sale included a VIN number, although construction equipment has serial numbers rather than VIN numbers since VIN numbers are for licensed vehicles such as cars. Also, the VIN number did not correspond to the correct serial number for the heavy equipment described on the bill of

10

sale and the price was "way overstated."  Additional bills of sale that were provided to Chen and Conroy for their heavy equipment investments had similar discrepancies.

### 6. Chen, Ang, and Conroy Fail to Receive the Promised Returns

Sometime in August 2008, when no profit or return of principal had been received on the first investment made by Chen and Ang, Chen started asking Richard a lot of questions.  Richard forwarded her questions to Francis and Chen then began to communicate directly with Francis regarding her concerns.  Francis explained, in an August 18, 2008 email to Chen, that their principal could be returned with 60 to 90 days notice.  Chen had thought that their principal would be automatically returned if they did not elect to roll it over into another investment.  In an August 21, 2008 email she asked Francis how he could keep track of the principal and indicated it would be better to have the principal returned.

Richard replied to Chen's queries in an August 21, 2008 email, in which he asked her to be patient since Francis was a full-time practicing physician and the person " 'on the ground' " in Georgia.  Chen understood that Richard and Francis were partners and that Francis was the person who was in direct contact with Spell and took care of the investment deals after the money was wired from California.  In an August 27, 2008 email, Richard advised Chen that the machine she had bought with the initial $87,000 investment "exists and is sitting on a lot.  It has a specific identification number.  The broker simply hasn't received the money for it yet.  You would be welcome to go to where the machine is to inspect it."

In September 2008 Chen received a profit of approximately $3,500 on the $87,000 investment and Conroy received a profit of $3,698.00 on his $87,000 investment.  In an October 12, 2008 email, Richard explained that one reason for the delay in receiving a return on their other investments was that the machines had been sold to a Middle East country during Ramadan.  By October 17, 2008, Richard had contacted the county sheriff

11

and the FBI.  Richard understood that Spell's "theft" of the funds invested by Chen, Ang, and Conroy took place after they made their investments.[10]

Chen, Ang, and Conroy never received any additional payment of profit or any return of the principal they had invested in the heavy equipment arbitrage program.  Chen testified that if she had known about Richard's criminal history, she would not have entered into an investment with him.  Richard, Katherine, and Francis assert that they also lost money that they had invested in the heavy equipment arbitrage program.

### C.  Dismissal of Cross-Complaint

On the morning of December 5, 2011, the last day of trial testimony, Richard voluntarily dismissed his cross-complaint against Francis.  The next day, Richard's attorney requested relief from the voluntary dismissal of the cross-complaint under Code of Civil Procedure section 473, subdivision (b) on the ground that he had mistakenly dismissed Richard's claim for indemnification against cross-defendant Francis.  The trial court denied Richard's request for relief and the case proceeded to jury verdict.

### D.  Special Verdict and Judgment

The jury rendered its special verdict on December 9, 2011.  The special verdict form asked the jurors to make findings on whether defendants were partners and on plaintiffs' claims for breach of contract, negligent misrepresentation, concealment, intentional misrepresentation, and economic damages.  The jurors found that
(1) defendants Richard and Francis were partners; (2) Richard and Francis were liable for breaching the contract for heavy equipment that they had entered into with plaintiffs;
(3) Richard was liable for negligent misrepresentation of an important fact to plaintiffs;
(4) Richard was liable for making a false representation of an important fact to plaintiffs

---

[10]  The complaint alleged that "[o]n October 16 and 18, 2008, [Richard] admitted in emails to Chen that their broker-dealer partner had taken $14,000,000 in funds, deserted his family and that the FBI was looking for him," but no evidence was presented at trial to support this allegation.

12

and either knowing that the representation was false or making the representation with a reckless disregard for the truth; (5) the total economic loss of plaintiffs Chen and Ang was $286,552; and (6) the total economic loss of plaintiff Conroy was $61,552.

The judgment entered on December 19, 2011, provided that plaintiffs would take nothing by way of their complaint from defendant Katherine and that plaintiffs would recover compensatory damages and prejudgment interest from defendants Richard and Francis. Chen and Ang were awarded the total amount of $546,394.66 plus costs and Conroy was awarded the total amount of $116,103.29 plus costs. Judgment was entered in favor of cross-defendant Francis on Richard's cross-complaint, pursuant to Richard's voluntary dismissal of the cross-complaint.

Plaintiffs subsequently filed a request for dismissal of the complaint as to defendant Francis only and Francis's dismissal was entered on January 31, 2012. Richard filed a timely notice of appeal from the December 19, 2011 judgment.

### III. DISCUSSION

#### A. *Evidentiary Error*

Richard's first contention on appeal is that the trial court committed prejudicial error in admitting evidence of his felony convictions because there is a reasonable probability that, absent the error, the jury would have reached a more favorable result.

#### 1. **Evidence Admitted Regarding Richard's Felony Convictions**

The record reflects that Richard brought a motion in limine to exclude evidence of, and any reference to, his felony convictions. He argued that his felony convictions had been expunged under Penal Code section 1203.4 (hereafter, section 1203.4)[11] pursuant to

---

[11] Section 1203.4, subdivision (a)(1) provides in part: "In any case in which a defendant has fulfilled the conditions of probation for the entire period of probation, or has been discharged prior to the termination of the period of probation, or in any other case in which a court, in its discretion and the interests of justice, determines that a defendant should be granted the relief available under this section, the defendant shall, at any time after the termination of the period of probation, if he or she is not then serving a

13

a trial court order filed on February 23, 2001, and therefore he had no duty to disclose his prior convictions to plaintiffs. Richard also argued that his felony convictions were inadmissible under Evidence Code section 788, subdivision (c),[12] which prohibits an attack on the credibility of the witness who has been convicted of a felony where the accusatory pleading against the witness has been dismissed pursuant to section 1203.4. The trial court denied Richard's motion in limine, finding that the evidence of Richard's felony convictions was relevant in light of Richard's representation of himself as a successful retired attorney and was not unduly prejudicial under Evidence Code section 352.

The evidence admitted with regard to Richard's felony convictions included the the October 15, 1996 jury verdict finding Richard guilty of two counts of perjury, one

---

sentence for any offense, on probation for any offense, or charged with the commission of any offense, be permitted by the court to withdraw his or her plea of guilty or plea of nolo contendere and enter a plea of not guilty; or, if he or she has been convicted after a plea of not guilty, the court shall set aside the verdict of guilty; and, in either case, the court shall thereupon dismiss the accusations or information against the defendant and except as noted below, he or she shall thereafter be released from all penalties and disabilities resulting from the offense of which he or she has been convicted, except as provided in Section 13555 of the Vehicle Code. . . . However, in any subsequent prosecution of the defendant for any other offense, the prior conviction may be pleaded and proved and shall have the same effect as if probation had not been granted or the accusation or information dismissed. The order shall state, and the probationer shall be informed, that the order does not relieve him or her of the obligation to disclose the conviction in response to any direct question contained in any questionnaire or application for public office, for licensure by any state or local agency, or for contracting with the California State Lottery Commission."

[12] Evidence Code section 788, subdivision (c) provides: "For the purpose of attacking the credibility of a witness, it may be shown by the examination of the witness or by the record of the judgment that he has been convicted of a felony unless: [¶] . . . [¶] The accusatory pleading against the witness has been dismissed under the provisions of Penal Code Section 1203.4, but this exception does not apply to any criminal trial where the witness is being prosecuted for a subsequent offense."

count of offering a forged document as genuine, and one count of falsifying documents to be used in evidence. The February 23, 2001 trial court order was also admitted into evidence. The order states in part: "IT IS HEREBY ORDERED AS FOLLOWS: [¶] The court enters a plea of not guilty on behalf of the defendant, RICHARD R. SUTHERLAND, vacates the guilty verdict, [and] dismisses the complaint against him pursuant to Penal Code section 1203.4." Additionally, Richard testified that he had been suspended from the practice of law by the California State Bar after suffering felony convictions for perjury, offering a forged document as genuine, and falsifying documents to be used as evidence.

During closing argument regarding plaintiffs' claims of concealment and intentional misrepresentation, plaintiffs' attorney argued that Richard had misrepresented that he was a successful retired lawyer and concealed the fact that he had lost his entitlement to practice law due to his perjury convictions and his resignation from the State Bar with disciplinary charges pending. Richard's attorney responded during his closing argument that Richard had successfully completed probation and his convictions had been dismissed.

The trial court gave a special jury instruction regarding the felony convictions that stated in part: "A record of Richard R. Sutherland's felony convictions is in evidence. After Richard Sutherland had completed his probation for the felony convictions, by order filed February 23, 2001, the court entered its order granting Richard Sutherland's application as follows: 'The court enters a plea of not guilty on behalf of the defendant, Richard R. Sutherland, vacates the guilty verdict, dismisses the complaint against him pursuant to Penal Code section 1203.4.' Thereafter, with an exception not applicable in this case, he was released from all penalties and disabilities resulting from the offenses for which he was convicted. [¶] As used in that section, 'penalties and disabilities' have reference to criminal penalties and disabilities or to matters of a kindred nature. The statute does not purport to 'expunge' the prior convictions. You may consider the

15

convictions, along with all the evidence in the case, in determining the issues presented for your consideration."

## 2. The Parties' Contentions

According to Richard, the trial court erred in admitting evidence of his felony convictions because the court's interpretation of section 1203.4 would require "a rehabilitated defendant" to include information about his or her dismissed felony conviction in a sales presentation in order not to mislead a prospective business contact about the rehabilitated defendant's character or standing in the community. Absent the court's evidentiary error, Richard argues, "the jury would have found this case to be just exactly what it was: the cumulative error of a group of otherwise sophisticated, well educated, affluent individuals who all thought they had discovered the exception to the rule that 'If something seems too good to be true, it probably is.' "

Richard further argues that the trial court committed reversible error because the court instructed the jurors that they could consider the felony convictions in determining the issues presented for their consideration, which allowed the jurors to improperly consider the convictions on the issue of Richard's credibility in violation of Evidence Code section 788, subdivision (c).

Plaintiffs respond that the trial court correctly determined that Richard's felony convictions were not expunged under section 1203.4 and could be used against him in certain circumstances beyond those specifically enumerated in the statute. According to plaintiffs, section 1203.4 cannot be construed to give Richard "a license to affirmatively misrepresent his professional status in the course of a prospectus for a financial investment." Plaintiffs explain that the evidence of Richard's felony convictions was properly offered to prove the falsity of Richard's representations that he was a successful attorney who had retired from the practice of law. They also emphasize that the trial court did not expressly instruct the jurors that they could consider Richard's convictions on the issue of his credibility. Even assuming that the jurors had not been informed of

Richard's felony convictions, plaintiffs argue, there was ample evidence to show that Richard made false or grossly misleading representations about the purchase of heavy equipment.

### 3. Section 1203.4

Section 1203.4 "permits a felon who has completed probation to apply to have the felony conviction dismissed. 'A grant of relief under section 1203.4 is intended to reward an individual who successfully completes probation by mitigating some of the consequences of his [or her] conviction and, with a few exceptions, to restore him [or her] to his [or her] former status in society to the extent the Legislature has power to do so [citations].' [Citation.]" (*Sanders v. Walsh* (2013) 219 Cal.App.4th 855, 872.) With certain exceptions not applicable here, Evidence Code section 788, subdivision (c) prohibits the admission of a felony conviction dismissed under section 1203.4 for the purpose of attacking the credibility of a witness. (See *ibid*.) It also has been held that dismissal of a felony conviction under section 1203.4 enables a defendant "to 'truthfully represent to friends, acquaintances and private sector employers that he has no conviction.' [Citation.]" (*People v. Arata* (2007) 151 Cal.App.4th 778, 788 (*Arata*); but see *People v. Holman* (2013) 214 Cal.App.4th 1438, 1465 (*Holman*) [statement in *Arata* that probationer who obtains relief under section 1203.4 may truthfully represent he or she has no conviction is dictum and there is no direct holding to support it]; see also *People v. Guillen* (2013) 218 Cal.App.4th 975, 998 ["dictum in *Arata* may overstate the case somewhat"].)

However, "[s]ection 1203.4 does not, properly speaking, 'expunge' the prior conviction. The statute does not purport to render the conviction a legal nullity. Instead it provides that, except as elsewhere stated, the defendant is 'released from all penalties and disabilities resulting from the offense.' The limitations on this relief are numerous and substantial . . . ." (*People v. Frawley* (2000) 82 Cal.App.4th 784, 791; see also

17

*Holman, supra,* 214 Cal.App.4th at p. 1463 [section 1203.4 does not expunge the conviction or render the conviction a legal nullity].)

### 4. Analysis

We will resolve Richard's claim of evidentiary error under the applicable standard of review, as set forth in this court's decision in *Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 281: "We review a trial court's evidentiary rulings for abuse of discretion. [Citation.] This is particularly so with respect to rulings that turn on the relevance of the proferred evidence. [Citation.] This standard is not met by merely arguing that a different ruling would have been better. Discretion is abused only when in its exercise, the trial court 'exceeds the bounds of reason, all of the circumstances before it being considered.' [Citation.] There must be a showing of a clear case of abuse and miscarriage of justice in order to warrant a reversal. [Citation.] A trial court will abuse its discretion by action that is arbitrary or ' "that transgresses the confines of the applicable principles of law." ' [Citations.] In appeals challenging discretionary trial court rulings, it is the appellant's burden to establish an abuse of discretion. [Citations.]"

The California Supreme Court has instructed that "[t]he phrase 'miscarriage of justice' has a settled meaning in our law, having been explained in the seminal case of *People v. Watson* (1956) 46 Cal.2d 818 []. Thus, 'a "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citation.] 'We have made clear that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance,* more than an *abstract possibility.*' [Citation.]" (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 800 (*Cassim*).)

The parties have not directed us to any legal authorities that address the admissibility of a defendant's felony convictions in a civil jury trial, for a purpose other than attacking witness credibility, where the convictions have been dismissed pursuant to

18

section 1203.4. Under the applicable standard of review, however, we need not determine whether the trial court erred in ruling that neither section 1203.4 nor Evidence Code section 788, subdivision (c) barred the admission of Richard's felony convictions at the jury trial in the present case. Even assuming that the trial court erred in admitting the evidence regarding Richard's felony convictions, we must determine whether it is reasonably probable that Richard would have achieved a more favorable result in the absence of that evidence, "[e]xamining the entire case, including the evidence adduced, the instructions delivered to the jury, and the entirety of [plaintiffs'] argument." (See *Cassim*, *supra*, 33 Cal.4th at p. 802.)[13]

Having carefully reviewed the record, we are convinced that it is not reasonably probable that Richard would have achieved a more favorable result at trial in the absence of the evidence regarding his felony convictions. (See *Cassim*, *supra*, 33 Cal.4th at p. 802.) Most significantly, we note that Richard testified without objection that he had resigned from the California State Bar in 1997 with disciplinary charges pending. Richard also admitted in his testimony that (1) he had represented to plaintiffs that he was a retired attorney; (2) stated in the Executive Summary for the heavy equipment arbitrage program that he provided to plaintiffs that he had a 25-year career as a successful real estate and business litigator; and (3) admitted that this description was intended "to create a sense of trust in [his] education, [his] business ability and [his] training." Therefore, even if the evidence of Richard's felony convictions had been excluded, there was evidence to show that Richard had intentionally misrepresented that he was a successful retired attorney in order to gain plaintiffs' trust, when the truth was that he ceased to

---

[13] At oral argument, Richard emphasized this court's decision in *Service by Medallion, Inc. v. Clorox* (1996) 44 Cal.App.4th 1807 as supporting his contention that admission of his felony convictions was error because the felony convictions were not relevant to the intrinsic merits of the heavy equipment investments. Since our analysis assumes, without deciding, that admission of the felony convictions was error, we need not further address this contention.

practice law in 1997 because he had resigned from the California State Bar with disciplinary charges pending.

Moreover, we agree with plaintiffs that ample evidence apart from Richard's felony convictions was presented with regard to his credibility and the misrepresentations he had made with respect to investing in the heavy equipment arbitrage program. For example, Richard encouraged Chen and Ang to invest in the heavy equipment arbitrage program in an email dated July 14, 2008, in which he stated: "I know who the players are. I mean, I really do know them. I know what the process is. I understand perfectly how the . . . heavy equipment operations work. I know and understand what the risks are, and they are among the least of anything I know, even banks." Then, in a July 25, 2008 email, Richard told Chen that "the money isn't simply 'floating' out there. It is always connected directly to a specific machine." Similarly, in an August 27, 2008 email, Richard advised a concerned Chen that the machine she had bought with the initial $87,000 investment "exists and is sitting on a lot. It has a specific identification number. The broker simply hasn't received the money for it yet. You would be welcome to go to where the machine is to inspect it."

In his trial testimony, Richard admitted—contrary to what he had been telling Chen and Ang in the above emails—that he had done nothing to verify that the equipment that the investors were buying actually existed and that he had also done nothing to acquaint himself with standard practices in the used heavy equipment industry. Based on this evidence alone, the jurors could reasonably find that Richard lacked credibility. The jurors could also reasonably determine from this evidence that Richard had intentionally, negligently, or with a reckless disregard of the truth made misrepresentations to plaintiffs about important facts concerning the heavy equipment arbitrage program.

Accordingly, we find no merit in Richard's contention that the trial court committed reversible error in admitting the evidence of his felony convictions, since it is

20

not reasonably probable that he would have achieved a more favorable result at trial in the absence of that evidence. (See *Cassim*, *supra*, 33 Cal.4th at p. 802.)

## B. Instructional Error

Richard's second contention on appeal is that the trial court erred in refusing the jury instructions that he proposed on causation, agency, and partnership. We will address the applicable standard of review before turning to each of the three types of instructional error claimed by Richard.

### 1. Standard of Review

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him [or her] which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) However, "[t]he trial court is not required to give every instruction offered by a litigant. [Citation.] Irrelevant, confusing, incomplete or misleading instructions need not be given. [Citations.]" (*Harris v. Oaks Shopping Center* (1999) 70 Cal.App.4th 206, 209.)

" 'The propriety of jury instructions is a question of law that we review de novo. [Citation.]' [Citation.] When the contention on appeal is that the trial court failed to give a requested instruction, we review the record in the light most favorable to the party proposing the instruction to determine whether it was warranted by substantial evidence. [Citation.]" (*Alamo v. Practice Management Information Corp.* (2013) 219 Cal.App.4th 466, 475 (*Alamo*).)

Where the trial court has committed instructional error, it is well established that "[a] judgment may not be reversed on appeal, even for error involving 'misdirection of the jury,' unless 'after an examination of the entire cause, including the evidence,' it appears the error caused a 'miscarriage of justice.' (Cal. Const., art. VI, § 13.) When the error is one of state law only, it generally does not warrant reversal unless there is a

21

reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached.  [Citation]  [¶]  Thus, when the jury receives an improper instruction in a civil case, prejudice will generally be found only ' "[w]here it seems probable that the jury's verdict may have been based on the erroneous instruction . . . . " '  [Citations]  That assessment, in turn, requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled.  [Citation.]"  (*Soule*, *supra*, 8 Cal.4th at p. 574.)

### 2.  Instructional Error—Causation

Richard contends that the trial court erred in refusing three jury instructions on causation that he requested, including modified versions of Judicial Council of California Civil Jury Instructions (CACI) No. 430 and CACI No. 433, as well as a special instruction on contract damages based on Civil Code section 3300.[14]

#### *Background*

As requested by Richard, modified CACI No. 430 stated:  "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.  [¶] Conduct is not a substantial factor in causing harm if the same harm would have occurred without that conduct."

Modified CACI No. 433, as requested by Richard, stated:  "Defendant, Richard Sutherland, claims that he is not responsible for plaintiffs' harm because of the later criminal conduct of Wendell Spell.  Defendant, Richard Sutherland, is not responsible

---

[14] Civil Code section 3300 states:  "For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."

22

[for] plaintiffs' harm if defendant proves both of the following: [¶] 1. That the criminal conduct of Wendell Spell happened after the conduct of defendant, Richard Sutherland; and [¶] 2. That defendant, Richard Sutherland, did not know and could not have reasonably foreseen that another person would be likely to take advantage of the situation created by defendant's conduct to commit this type of act."

The special jury instruction based on Civil Code section 3300 that Richard requested stated: "In a contract action, the damages recoverable by an aggrieved party are those proximately caused by the breach."

The trial court stated on the record that "[t]he Court does not propose to give [CACI No.] 430 or [CACI No.] 433 because the details of the instructions, including issues of causation and reliance and the like are both completely and adequately covered in the CACI instructions on fraud and involvement." In a handwritten note on the proposed jury instruction based on Civil Code section 3300 the court similarly stated: "Damages instructions were adequately covered in other instructions."

### The Parties' Contentions

We understand Richard to argue that the trial court's refusal to give the instructions he requested on causation improperly prevented the jurors from considering his defense theory that "he was not responsible for Plaintiffs' harm because of the later criminal conduct of Wendell Spell."

Richard contends that his argument is supported by juror question No. 1, which stated: "Given a vote of 'yes' on [special verdict question No.] 16 [Was plaintiff's or plaintiffs' reliance on any of defendant's or defendants' representation(s) a substantial factor in causing harm to each plaintiff?] as harmed. In [special verdict question No.] 17 [if your answer to question No. 16 is yes, then answer question No. 17 (What are plaintiffs' damages?)], is an amount of greater than zero required?" The trial court answered: "Harm in an economic sense is not zero or nothing." According to Richard, juror question No.1 shows that the jurors "thought it was possible . . . that the *economic*

23

harm to Plaintiffs was due to other factors (such as, perhaps, Wendell Spell's criminal activity."

Plaintiffs argue to the contrary that the trial court properly refused the CACI No. 433 instruction requested by Richard because there were no facts or circumstances to show an unforeseeable, intervening cause that would "cut off" Richard's liability. Plaintiffs also argue there was no need to give an additional instruction defining "substantial factor," such as the version of CACI No. 430 proposed by Richard, because the special verdict forms expressly required the jurors to find that defendants' conduct was a substantial factor in causing plaintiffs' harm before liability could attach for negligent and intentional misrepresentation. Additionally, plaintiffs argue the evidence was clear that Richard's misrepresentations "played a significant role in inducing plaintiffs to purchase the equipment."

*Analysis*

It has been held that "[c]riminal conduct which causes injury will ordinarily be deemed *the* proximate cause of an injury, superseding any prior negligence which might otherwise be deemed a contributing cause. [Citation.] However, '[i]f the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' [Citations.]" (*Koepke v. Loo* (1993) 18 Cal.App.4th 1444, 1449 (*Koepke*).)

Accordingly, we have reviewed the record in the light most favorable to Richard in order to determine whether the trial court erred because the instructions requested by Richard were warranted by substantial evidence that Spell's criminal conduct caused plaintiffs' harm. (See *Alamo*, *supra*, 219 Cal.App.4th at pp. 475-476.) We find that the evidence is insufficient. The only showing that Richard made regarding Spell's alleged criminal conduct was in his trial testimony, as set forth in the following colloquy:

24

"[RICHARD'S ATTORNEY]: To your knowledge, did Mr. Spell's theft of funds that you deposited with Tom Francis take place after you made those deposits with Dr. Francis?

"[RICHARD]: It took place after I sent the money.

"[RICHARD'S ATTORNEY]: Likewise, is it your understanding that Mr. Spell's theft of funds, specifically the plaintiffs' funds in this case, took place after the Plaintiffs had made their investments?

"[RICHARD]: Yes."

It is axiomatic that the attorney's questions are not evidence. (Evid. Code § 140.) It is also axiomatic that "the testimony of a witness concerning a particular matter is inadmissible unless he [or she] has personal knowledge of the matter." (Evid. Code, § 702, subd. (a); see *Heater v. Southwood Psychiatric Center* (1996) 42 Cal.App.4th 1068, 1074, fn. 4.) In the absence of any indication that Richard's testimony regarding Spell's theft was based on personal knowledge rather than his "understanding," there was no evidence to show that Spell had stolen the funds that plaintiffs had invested in the heavy equipment arbitrage program. The instructions proposed by Richard on substantial factor and superseding cause were not warranted because there was not substantial evidence for the jurors to find that Spell had committed criminal conduct that was the proximate cause of plaintiffs' harm. (See *Koepke*, *supra*, 18 Cal.App.4th at pp. 1449-1450.) Moreover, "it is improper to give an instruction that lacks support in the evidence, even if the instruction correctly states the law [citation]." (*Hart v. Browne* (1980) 103 Cal.App.3d 947, 965.)

We also find no merit in Richard's claim that the trial court erred in refusing his proposed special instruction that was based on Civil Code section 3300. The special jury instruction stated: "In a contract action, the damages recoverable by an aggrieved party are those proximately caused by the breach." As this court has stated, "A party is not entitled to have the jury instructed in any particular fashion or phraseology, and may not

25

complain if the court correctly gives the substance of the applicable law. [Citation.]" (*Thompson Pacific Construction, Inc. v. City of Sunnyvale* (2007) 155 Cal.App.4th 525, 553 (*Thompson Pacific*).)

The record reflects that the trial court instructed the jurors as follows with respect to breach of contract: "To recover damages from defendants Richard Sutherland and Thomas Francis, M.D. for breach of contract, plaintiffs must prove all of the following: [¶] 1. That plaintiffs and defendants Richard Sutherland and Thomas Francis, M.D. entered into a contract; [¶] 2. That plaintiffs did all, or substantially all, of the significant things that the contract required them to do; [¶] 3. That all conditions required by the contract for defendants Richard Sutherland and Thomas Francis, M.D.'s performance have occurred; [¶] 4. That defendants Richard Sutherland and Thomas Francis, M.D. failed to do something that the contract required them to do; and [¶] 5. That plaintiffs were harmed by that failure."

We find that the trial court's jury instruction on breach of contract correctly gave the substance of the applicable law. (See *Thompson Pacific*, *supra*, 155 Cal.App.4th 525, 553.) " 'To be entitled to damages for breach of contract, a plaintiff must plead and prove (1) a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff. [Citations.]' [Citation.] *Implicit in the element of damage is that the defendant's breach caused the plaintiff's damage.*" (*Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1352, italics added.) Thus, the trial court did not err in refusing Richard's proposed special instruction because "[i]t is not error . . . to refuse to give an instruction requested by a party when the legal point is covered adequately by the instructions that are given. [Citation.]" (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.)

### 3. Instructional Error—Agency

Richard contends that the trial court erred in refusing the instructions that he proposed on his defense theory "that he was an agent (or a 'finder') for his co-defendant,

26

respondent, Francis, and/or Wendell." According to Richard, the trial court's refusal "completely foreclos[ed] a defense verdict on that theory."

### Background

The record reflects that Richard proposed several special instructions regarding agency that the trial court refused, as follows: (1) "An agent who makes an untrue statement to a third party based on false information provided by the principal is not liable unless agent had notice that statement was false."; (2) "Where the agent has disclosed the name or names of the principals to the plaintiffs and the principals['] names appear on the contract, it is deemed that the plaintiffs intended to bind the principals and not the agent."; (3) "Where an agent's conduct has resulted in mere economic loss and not physical damage to person or property, the agent is not liable to third persons such as plaintiffs in this case."; (4) "Where the agent has disclosed the identity of the principal in the contract, the principal and not the agent is held liable for any breach."; and (5) "Agreement to share in profits from sale of heavy machinery where there was no joint ownership, joint liability or joint control of the business and where there was no sharing of overhead expenses was one of agency and not partnership."

The record on appeal does not indicate the trial court's reasoning in refusing Richard's proposed special instructions on agency.

### The Parties' Contentions

Richard contends that the trial court committed instructional error in refusing to instruct on agency because there was substantial evidence that he was the agent of Francis. Richard points to the evidence of his arrangement with Francis, whereby Francis told him "what investments were available, the cost, likely profit and timing," the investors sent their money directly to Francis, and Francis provided the investors with bills of sale in Francis's name only. Additionally, since plaintiffs only sought economic loss, Richard argues that he could not be liable to third parties for breach of contract since an agent is not liable for economic losses.

27

Plaintiffs acknowledge that "[i]t is the law that an agent is not normally personally liable on a claim for economic damages if the contract is in the name of the principal." They argue, however, that the only written contract documents in this case identified Richard as a principal, since the memoranda documenting plaintiffs' investments in the heavy equipment arbitrage program were prepared by Richard on his letterhead and signed by him.

### *Analysis*

It is well established that "[a]n appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority. [Citations.] Accordingly, we cannot conclude that the refusal to give an instruction was error absent an adequate showing that the proposed instruction was proper. [Citation.]" (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685 (*Bullock*.)

Richard has not met his burden to show that any of his five proposed special instructions on agency were proper since he does not expressly address the propriety of any of those instructions in his argument on appeal. He makes only a general argument that the trial evidence showed that he was the agent of Francis and therefore the trial court's refusal to give the special instructions he proposed on agency prevented him from establishing an agency defense. Accordingly, since Richard has "not shown that any particular proposed instruction was proper," we determine that Richard has not shown error in the denial of any of his proposed agency instructions. (*Bell v. H.F. Cox, Inc.* (2012) 209 Cal.App.4th 62, 81.)

### 4. Instructional Error—Partnership

Richard argues that the trial court erred in refusing all of the special instructions that he proposed on partnership because the instructions that the trial court gave on partnership prevented the jury from finding, as the evidence showed, that he and Francis were not partners.

28

*Background*

The record reflects that Richard proposed the following 11 special instructions on partnership: (1) "A partnership is an entity distinct from its partners."; (2) "The mere fact that compensation to one or all of the parties is dependent upon the enterprise producing a profit, and that such profit is shared in proportions, does not constitute the arrangement of a co-partnership. Profit testing is not the test of partnership."; (3) "The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right or interest in property from which the returns are derived."; (4) "Joint tenancy, tenancy in common, tenancy by the entireties, joint property, common property, or part ownership does not by itself establish a partnership, even if the co-owners share profits made by the use of the property."; (5) "A payment from business profits is a lawful method to compensate a party for referral services. The fact that Thomas Francis paid a referral fee to defendant, Richard Sutherland, does not, by itself, mean that defendant Richard Sutherland and Thomas Francis were conducting business as partners."; (6) "A partnership is not liable for property sold and delivered to one partner in his individual capacity. A partnership is not liable to a plaintiff where the property was taken in the name of the individual member and the deposit was taken and retained by him."; (7) "A contract executed by an individual is presumed to be the contract of the individual and not of a partnership to which the individual belongs. The party alleging liability of the partnership for the contract signed by an individual bears the burden of proof on this issue."; (8) "The party alleging the existence of a partnership has the burden of proving that fact by a preponderance of the evidence."; (9) "In the absence of joint ownership, joint liability, and joint control of a business, an agreement to share the profits, alone, does not establish that a business is a partnership."; (10) "A limited liability company is not a partnership."; and (11) "An agreement to share the profits of a business does not create a partnership unless each partner has equal rights in the management and conduct of the partnership business."

29

The trial court placed a handwritten note on the first of Richard's proposed partnership instructions that states: "The court refused the following partnership instructions offered by Richard [and] Katherine Sutherland, M.D. . . . because the [court] concluded that the instructions given were appropriate."

### *The Parties' Contentions*

According to Richard, the trial court improperly failed to give instructions that would have permitted the jurors to find that the evidence showed that he and Francis were not partners. Specifically referring to two proposed special instructions on profit sharing and on equal rights in the management and control of the business, Richard argues that "[t]he court's refusal to give these instructions prevented the jury from even considering the factors (such as lack of joint control and the lack of an agreement to share losses) that would have allowed it to find there was no partnership." Richard also argues that a special instruction given by the trial court that was entitled " 'Presumption of the Existence of an Partnership' "[15] improperly "shifted the jury's focus to the 'presumed' partnership" and "very likely misled the jury and affected the verdict."

Plaintiffs respond that the special instructions that the trial court gave on partnership were properly derived from various provisions in the Corporations Code and that the two instructions proposed by Richard on profit sharing and equal rights in management and control of the business were based on decisions that predate the modern Corporations Code. Plaintiffs also argue that the evidence established the elements of actual and apparent partnership between Richard and Francis (for example, they referred to themselves as partners and were associated in a common endeavor with an agreement

---

[15] "(Special Instruction 5) Presumption of the Existence of a Partnership" states: "The sharing of gross returns does not by itself establish a partnership, even if the persons sharing them have a joint or common right of interest in property from which the returns are derived. [¶] A person who stands to receive a share of the profits is presumed to be a partner absent evidence that the profit is a payment unrelated to the earnings of the partnership."

30

to split the profits), and therefore the trial court correctly instructed the jurors on both actual and apparent partnership.

*Analysis*

We reiterate that "[a]n appellant must affirmatively demonstrate error through reasoned argument, citation to the appellate record, and discussion of legal authority. [Citations.] Accordingly, we cannot conclude that the refusal to give an instruction was error absent an adequate showing that the proposed instruction was proper. [Citation.]" (*Bullock*, 159 Cal.App.4th at p. 685.) Richard has again failed to meet this burden.

Of the 11 special instructions on partnership that Richard requested and the trial court refused, he only mentions two—one on profit sharing and one on equal rights in the management and control of the business—in his argument on appeal. Richard does not support his argument that these two special instructions should have been given with any citation to legal authority regarding the appropriate instructions on partnership, with the exception of his contention that his proposed special instruction on equal rights in the management and control of the business was properly derived from Corporations Code section 16401, subdivision (f).[16]

Instead, Richard makes the conclusory assertion that the absence of these two instructions prevented the jurors from considering factors that would have allowed the jurors to find that he and Francis were not partners. He provides no legal authority for the proposition that a special instruction based on Corporations Code section 16401, subdivision (f) is necessary for the trier of fact's determination of partnership.[17]

---

[16] Corporations Code section 16401, subdivision (f) states: "Each partner has equal rights in the management and conduct of the partnership business."

[17] The CACI instruction on partnership states: "A partnership and each of its partners are responsible for the wrongful conduct of a partner acting within the scope of his or her authority. [¶] You must decide whether a partnership existed in this case. A partnership is a group of two or more persons who own a business in which all the partners agree to share the profits and losses. A partnership can be formed by a written or

31

Accordingly, we determine that Richard has not shown error in the trial court's refusal of his proposed special instructions on partnership.

## C. *Code of Civil Procedure section 473, subdivision (b) Motion for Relief*

Richard's final contention on appeal is that the trial court abused its discretion in denying his Code of Civil Procedure section 473, subdivision (b) (hereafter, section 473, subdivision (b)) motion for relief from his voluntary dismissal of his cross-complaint against Francis.

### *Background*

On the morning of December 5, 2011, the last day of trial testimony, Richard dismissed his cross-complaint against Francis, as indicated in the following colloquy.

"THE COURT:  The development that just happened was that [Richard's attorney] indicated in chambers this morning that Richard Sutherland will dismiss the cross-complaint against Dr. Tom Francis.  Does he need to do that right now?

"[RICHARD'S ATTORNEY]:  That's correct.  We are going to dismiss that.  Mr. Sutherland is present in court.  Do you agree to that, sir?

"[RICHARD]:  Yes, sir, I do."

The next day, December 6, 2011, Richard's attorney requested relief from Richard's voluntary dismissal of the cross-complaint, pursuant to section 473, subdivision (b) as follows:

"[RICHARD'S ATTORNEY]:  Your Honor, the first thing . . . is based upon a mistake that I made yesterday, and I'm asking for relief under [section] 473(b), of the Code of Civil Procedure.  [¶]  What I did was — my intention was to dismis[s] [the]

oral agreement or by an agreement implied by the parties' conduct."  (CACI No. 3711.)
Corporations Code section 16202, subdivision (a) provides in part:  "the association of
two or more persons to carry on as coowners a business for profit forms a partnership,
whether or not the persons intend to form a partnership."

32

Cross-Complaint for damages. In other words, I was not putting on any evidence regarding damages, but mistakenly included in the dismissal of the Cross-Compliant was the indemnification cause of action. [¶] I did not intend nor my client in particular nor I, intended to get rid of the indemnification. I'm asking for [relief] under [section] 473(b) to be allowed to proceed with that cause of action because two-fold: [¶] Number 1, it was my mistake. I don't think my client should be penalized for that. [¶] Number 2, no additional testimony was or is needed for that cause of action. My thought process was that we would not proceed on the breach of contract cause of action, the common cause, cause of action, the other causes of action, but did not mean to give up my client's right to seek indemnification in the event the jury found he is liable, but Dr. Francis is equally liable and [Richard] should be indemnified for any losses. [¶] . . . [¶]

"[THE COURT]: Do you have jury instructions and forms of verdict on any portion of the Cross-Complaint that you brought here today?

"[RICHARD'S ATTORNEY]: I don't. I just wanted to bring it to the court's attention and make a ruling. [¶] . . . [¶] I admit it was definitely my mistake. This falls on me and no one else. Candidly, when I went back into chambers and I told the Court that we would be able to shorten it up because I had talked to my client and prevailed upon him that I didn't think it was worth pursuing the Cross-Complaint for damages. [¶] I just didn't think about the indemnification or the second cause of action [for] apportion[ment] of fault."

The trial court denied Richard's request for relief under section 473, subdivision (b) on the grounds that Richard had offered no jury instruction or verdict form with respect to the cross-complaint and "it would be very prejudicial at this time [to grant relief] with the case having been submitted and without providing really an opportunity for Dr. Francis to defend the Cross-complaint, it would just be a violation of rights."

33

Richard argues that his motion for relief under section 473, subdivision (b) should have been granted because it was promptly made and "[i]t is clear that [his] counsel was not guilty of 'inexcusable neglect'." He further contends that there would have been no prejudice to Francis in granting relief from the dismissal of the cross-complaint since no additional testimony was needed and only "a small amendment" to the special verdict and jury instructions was necessary.

In response, Francis contends that (1) the appeal must be dismissed because Richard failed to include the order denying his motion for relief under section 473, subdivision (b) in his notice of appeal and no timely sufficient notice of appeal was filed; (2) even if the notice of appeal is sufficient, Richard lacks standing to appeal since he is not aggrieved in the absence of any entitlement to recover on an indemnity theory; (3) the trial court did not abuse its discretion because the motion did not either comply with the requirements for mandatory relief under section 473, subdivision (b) or include a showing of excusable neglect or mistake adequate for discretionary relief; and (4) granting the motion would result in prejudice because the case was submitted to the jury without Francis having the opportunity to defend the cross-complaint.

*Analysis*

As a threshold matter, we consider whether the trial court's order denying Richard's motion for relief from his voluntary dismissal of the cross-complaint is appealable. The order was expressly included in the December 19, 2011 judgment, which stated, "Judgment is entered in favor of defendant and cross-defendant Thomas Francis on the cross-complaint of defendant and cross-complainant RICHARD R. SUTHERLAND, pursuant to the voluntary dismissal of said cross-complaint, as recited on the record." Since the order was included in the judgment, it was appealable. (See *Bias v. Wright* (2002) 103 Cal.App.4th 811, 817 [judgment incorporating order granting motion was a final appealable judgment under Code of Civil Procedure section 904.1,

34

subdivision (a)(1)]; see also *Leader v. Health Industries of America, Inc.* (2001) 89 Cal.App.4th 603, 611 [order denying motion to vacate dismissal under section 473 is appealable].)  Moreover, Richard's notice of appeal clearly stated that he was appealing from the December 19, 2011 judgment.

We will therefore consider the merits of the order denying Richard's motion under section 473, subdivision (b) for relief from his voluntary dismissal of the cross-complaint. The California Supreme Court has instructed that a party may obtain relief under section 473, subdivision (b) from a voluntary dismissal.  (*Zamora v. Clayborn Contracting Group, Inc.* (2002) 28 Cal.4th 249, 254-255 (*Zamora*).)  We understand Richard to argue that he was entitled to either mandatory or discretionary relief under section 473, subdivision (b).

This court stated the requirements for obtaining mandatory relief under section 473, subdivision (b) in *Huh v. Wang* (2007) 158 Cal.App.4th 1406.  "In certain cases of attorney fault, section 473(b) requires the trial court to grant relief.  The mandatory relief provision states in pertinent part:  'Notwithstanding any other requirements of this section, the court shall, whenever an application for relief is made no more than six months after entry of judgment, is in proper form, and is accompanied by an attorney's sworn affidavit attesting to his or her mistake, inadvertence, surprise, or neglect, vacate any (1) resulting default entered by the clerk against his or her client, and which will result in entry of a default judgment, or (2) resulting default judgment or dismissal entered against his or her client, unless the court finds that the default or dismissal was not in fact caused by the attorney's mistake, inadvertence, surprise, or neglect.'  (§ 473(b).)  [¶]  . . .  'If the prerequisites for the application of the mandatory relief provision of section 473, subdivision (b) exist, the trial court does not have discretion to refuse relief.'  [Citation.]"  (*Id.* at p. 1414.)

The record reflects that Richard failed to comply with the requirements for obtaining mandatory relief, since his attorney did not submit a sworn affidavit of fault in

35

support of his motion for relief under section 473, subdivision (b).  We therefore turn to the question of whether the trial court erred in denying discretionary relief from Richard's voluntary dismissal of the cross-complaint.

"As relevant here, the discretionary relief provision of section 473, subdivision (b) provides that: 'The court may, upon any terms as may be just, relieve a party or his or her legal representative from a judgment, dismissal, order, or other proceeding taken against him or her through his or her mistake, inadvertence, surprise, or excusable neglect.' " (*Zamora*, *supra,* 28 Cal.4th at p. 254.)  Thus, " '[a] party who seeks relief under section 473 on the basis of mistake or inadvertence of counsel must demonstrate that such mistake, inadvertence, or general neglect was excusable because the negligence of the attorney is imputed to his [or her] client and may not be offered by the latter as a basis for relief.' [Citation.]" (*Id.*, at p. 258.)

"In determining whether the attorney's mistake or inadvertence was excusable, 'the court inquires whether "a reasonably prudent *person* under the same or similar circumstances" might have made the same error.' [Citation].  In other words, the discretionary relief provision of section 473 only permits relief from attorney error 'fairly imputable to the client, i.e., mistakes anyone could have made.' [Citation.] 'Conduct falling below the professional standard of care, such as failure to timely object or to properly advance an argument, is not therefore excusable.  To hold otherwise would be to eliminate the express statutory requirement of excusability and effectively eviscerate the concept of attorney malpractice.' [Citation.]" (*Zamora*, *supra*, 28 Cal.4th at p. 258.)

The standard of review is abuse of discretion.  " 'A ruling on a motion for discretionary relief under section 473 shall not be disturbed on appeal absent a clear showing of abuse.' [Citation.]" (*Zamora*, *supra*, 28 Cal.4th at p. 257.)  "Where the mistake is excusable and the party seeking relief has been diligent, courts have often granted relief pursuant to the discretionary relief provision of section 473 if no prejudice to the opposing party will ensue.  [Citations.]" (*Id*. at p. 258.)

In the present case, the trial court determined that Richard did not make a sufficient showing of excusable mistake. When Richard's attorney made his oral motion for relief from Richard's voluntary dismissal of the cross-complaint, the attorney stated that "my intention was to dismis[s] [the] Cross-Complaint for damages. In other words, I was not putting on any evidence regarding damages, but mistakenly included in the dismissal of the Cross-Compliant was the indemnification cause of action. [¶] I did not intend nor my client in particular nor I, inten[d] to get rid of the indemnification. I'm asking for [relief] under [section] 473(b) to be allowed to proceed with that cause of action because . . . [¶] Number 1, it was my mistake. . . . [¶] . . . [¶] I just didn't think about the indemnification or the second cause of action [for] apportion[ment] of fault."

Richard's attorney did not offer any further explanation that demonstrated that the mistake was excusable because " ' "a reasonably prudent person under the same or similar circumstances" might have made the same error.' [Citation]." (*Zamora*, *supra*, 28 Cal.4th at p. 258.) We therefore conclude that the trial court did not abuse its discretion in denying Richard's motion for relief under section 473, subdivision (b) from his voluntary dismissal of the cross-complaint.

## IV.  DISPOSITION

The December 19, 2011 judgment is affirmed.  Costs on appeal are awarded to respondents.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.

WE CONCUR:

_____
MÁRQUEZ, J.

_____
GROVER, J.

38